AMERICAN BOX MACH. CO. v. CROSMAN et al.

(Circuit Court, D. Massachusetts. September 7, 1892.)

No. 2,758.

**1. EQUITY PLEADING—BILL WITH DOUBLE ASPECT—PARTIES.**
Where a bill sets out a contract relating to certain patents, and asks specific performance thereof against several parties, but also contains expressions looking to relief as in a suit for infringement, it cannot be sustained as a bill with a double aspect, because the determination of who are proper parties must be made from different standpoints in the two kinds of bills.

**2. SAME—CONSTRUCTION OF BILL—ELECTION BY RESPONDENTS.**
A bill which looks towards double relief, but which is not sustainable as a bill with a double aspect, cannot be dismissed on that ground when defendants fail to make the objection; but it is nevertheless the duty of the court to see that the litigation is put in proper form to be disposed of understandingly, and, where respondents have apparently accepted the bill as one for specific performance, the court will treat it in that light, as respondents are entitled to make such election.

**3. EQUITY JURISDICTION—REMEDY AT LAW—SPECIFIC PERFORMANCE.**
A court of equity has jurisdiction of a bill to enforce a written contract whereby defendants have covenanted not to manufacture and sell any machines infringing certain patents claimed by complainants, and under which they are making and selling machines, since the continuance of such violation would tend to diminish complainants' profits in the business, for which mere damages, recoverable at law, would not be an adequate remedy.

**4. SAME—PARTIES—INJUNCTION.**
In such case the fact that one of the parties to the contract is a special or limited partner in a firm which is engaged in using the infringing machines is no objection to making him a defendant, or enjoining him from continuing to violate the contract in connection with the partnership, although his partners were not parties to the contract, and cannot, therefore, be made parties to the suit, and although they will be embarrassed by an injunction against him.

In Equity. Bill for the specific performance of a contract. Decree for complainant.

The contract in question in this case was executed January 23, 1888, and is as follows: "This agreement, made and entered into by and between the American Box Machine Company, of Amsterdam, New York, party of the first part, and George A. Crosman, John C. Metcalf, and John B. Rollins, all of Lynn, Massachusetts, and George W. Glazier, of Salem, Massachusetts, parties of the second part, and the Lynn Box Machine Company, of Lynn, Massachusetts, party of the third part, witnesseth: Whereas, party of the first part is the owner of certain letters patent of the United States for box-covering machinery, among them letters patent dated July 26, 1881, granted to Gordon Monro, numbered 244,919, and letters patent dated May 27, 1884, granted to Horace Inman, numbered 299,225; and whereas, the parties of the second part heretofore made or sold or used box-covering machines which party of the first part claimed to be infringements upon the said letters patent; and whereas, party of the first part, on or about —— brought suit against Crosman and Metcalf, and also another suit against said Rollins and Glazier, for alleged infringement upon said patent No. 244,919, and also, on or about the —— day of ——, another suit against said parties of the second part conjointly, for alleged infringement of said patent No. 299,225; and whereas, the parties of the second part, in June last, organized themselves into a corporation under the laws of the state of New Hampshire, entitled the 'Lynn Box Machine Company,' which has succeeded to their business

as manufacturers of paper-box machinery; and whereas, said party of the third part, by assignment, is the owner and holder of certain letters patent of the United States granted to said George W. Glazier, both dated April 5, 1887, and numbered, respectively, 360,582 and 360,583; and whereas, the parties hereto are desirous of settling all questions of difference between them: Now, therefore, the parties hereto covenant—agree—each with the other as follows: First. Decrees shall be entered in each of said suits according to the prayer of the bill therein. The counsel for the defendants therein shall consent thereto, either orally in open court, or in writing, as party of the first part may elect. Second. All costs and accounting in each of said suits is hereby waived. Third. In the event of breach of this agreement by party of the first part in such manner as to materially affect the rights of parties of the second and third parts, or of the trustees herein provided for, then said decrees in each of said cases are to be vacated at the election of the defendants in said cases, and the same shall proceed for judicial determination. Fourth. A trust shall be forthwith created, and a trustee, who shall be approved by party of the first part, shall acquire title to said patents of party of the third part; and said trustee shall forthwith, upon his assuming said trust, give and grant to the party of the first part an exclusive license to make, use, and sell throughout the United States, and until the 27th day of May, 1901, to which date this agreement shall remain in force, the inventions described and claimed in said letters patent as assigned to him; and the party of the first part shall have the right to institute or defend suits or proceedings, as it may elect, in the name of the said trustee, the expense thereof to be borne by party of the first part. Upon the creation of said trust, and the acceptance thereof by said trustee, the parties of the second and the third parts shall forthwith cease to carry on the business of making, using, or selling box-making machinery covered by said patents, or other patents now owned by the party of the first part, except as hereinafter provided. Fifth. The said trustee shall be constituted, by party of the first part, its agent irrevocable, during the continuance of this agreement, to sell all machinery made or controlled by party of the first part in any wise applicable to the manufacture of paper boxes, with a commission for selling of fifteen per cent. on the gross selling price. The selling power of said trustee may be delegated by him to other persons, to be approved by party of the first part, or, if not, then such trustee to be responsible personally for the unauthorized acts of said agents. All machines sold shall be billed in the name of party of the first part, and all business shall be transacted by said trustee and by his salesman in the name of party of the first part, and upon the same terms as party of the first part gives to its customers. Sixth. Said trustee shall have the exclusive right to make, or cause to be made, the single-strip machines for 'topping' and 'covering' that embody the inventions, or substantial parts thereof, described in the said patents owned by party of the third part, and shall receive therefor, from party of the first part, the sum of forty ($40) dollars for each of said machines, which shall be constructed in good and substantial manner, as are made by party of the third part, and may embody in said machines, at the same cost of manufacture, any of the improvements described in letters patent owned or controlled by party of the first part, provided said added parts do not constitute a 'double-strip' machine. The said sum—forty dollars—shall be paid to said trustee for the machines of the size and style theretofore sold by party of the third part for one hundred dollars, and for the machines of the size and style theretofore sold by it for one hundred and twenty-five dollars an additional cost price shall be allowed, equal to the additional expense incurred in making the same, and the selling price of said last-named machines may, if desired by party of the first part, be advanced at least sufficiently to cover such additional cost; and, if, at any time thereafter, the said trustee or persons associated with him make further supposed improvements, they shall be submitted to the party of the first part, and, if approved by it, then an allowance shall be made, and added to the cost price of said machine, equal to the excess of costs, if any, required to make the machines with such improvements. If the said improvements are not approved by party of the first part, then the said trustee shall have the right to embody said supposed improve-

ments in said machines at the original price, to wit, forty dollars, ($40,) and sell the same in the market as and for the price that the original machines are sold. If, at any subsequent time, the party of the first part shall decide to approve and adopt the said improvements, then it shall allow actual cost of making said improvements in addition to the forty dollars, ($40,) above stated. There shall also be allowed to the said trustee the sum of twenty-five dollars on each machine, of whatever kind, which shall embody any of the inventions licensed as aforesaid by said trustee to party of the first part, or any material and substantial part thereof, whether said machines shall have been sold by party of the first part or by said trustee; and, if said machine shall have been leased by party of the first part, then twenty-five per cent. of the rental thereof shall be paid, when received, to said trustee, until the sum of twenty-five dollars per machine shall have been so paid. Said trustee shall be paid the further sum of fifteen dollars ($15) on each topping or covering machine made and sold by him, said fifteen dollars to be in lieu of all other selling commissions whatsoever. Seventh. The selling price of the single-strip covering machines of the size and style heretofore sold by party of the third part for one hundred dollars, hereafter to be made by said trustee, and also the single-strip machines made by party of the first part, shall be one hundred and fifty dollars ($150) each; and the price at which the topping machines made by said trustee shall be sold shall be one hundred and fifty dollars, ($150.) The said prices shall be cash prices, without variation, division, or allowance, or commissions to purchasers or others, except such variation as to terms of payment as may be from time to time agreed upon by the party of the first part and by said trustee, in writing, which terms shall be the same as given by the party of the first part to his customers for machines for a similar purpose. The topping machines made by the party of the first part shall not be sold for a sum less than one hundred and fifty dollars, ($150,) upon terms of payment the same as above stated. Eighth. If the party of the first part shall reduce the price of its double-strip machines, which are now sold at three hundred dollars, ($300,) then the price of the single-strip machine made by said trustee shall be reduced one-half the amount of such reduction, the manufacturing cost, royalty, and commissions to remain unchanged. Ninth. All orders from purchasers furnished by said trustee shall be filled by the party of the first part, unless there is reasonable ground to question the ability of the purchaser to pay for the same, and then the order shall be filled, provided good and sufficient sureties, are furnished for said payments. Tenth. The party of the first part agrees to advertise, in its catalogue and otherwise, the said machines made by said trustee, and put the same upon the market in substantially the same manner, and with the same advantage, as it does the machines of a similar character made by it. Eleventh. Regarding the machines, both covering and topping, heretofore sold by parties of the second or third parts, it is agreed as follows: (a) No interference shall be made by the party of the first part with the free use of the machines which are now in the shop lately owned by said Crossman, in Lynn, Massachusetts, and by him sold to one Theodore Pinkham, and no claim for damages or royalty made therefor. (b) A full list of all machines sold by said parties of the second and third parts for covering or topping boxes shall be forthwith furnished to party of the first part, which shall state those not already delivered. (c) No claim shall be made by party of the first part against any purchaser of machines which have been delivered, but not paid for. (d) No claim shall be made against any purchaser of such delivered machines against whom no bill has been filed. (e) Party of the first part will hold the parties of the second part harmless for all liabilities to purchasers by reason of sales of said machines made prior to the formation of the party of the third part. (f) The said trustee shall forthwith notify all purchasers, stated in subdivisions c and d of the clause, that the machines bought by them have been licensed by the party of the first part. Twelfth. Statements shall be exchanged, and settlements made for the preceding statement, on the first days of January, April, July, and October of each year, or within seven days thereafter, for all machines sold and paid for, and each of said parties shall keep books of account of all the transactions embraced in this agreement, which shall at all reasonable times be open to the in-

spection of either of said parties or their duly-authorized agents. Thirteenth. Upon the termination of this agreement, party of the first part shall reassign to said trustee, or his successor, all rights conveyed to it under the license from said trustee hereinbefore provided. Fourteenth. The said trustee shall have the right to collect for all sales of machinery made by him or his salesmen under this agreement. And whereas, the parties of the second part believe that the single-strip machine made by them can be perfected and modified so as to constitute a double-strip machine superior to the double-strip machines now made by party of the first part, it is therefore agreed that said trustee may experiment and construct machines embodying such improvements to the end stated, and may place them, not exceeding three at any one time, in such box shops as he may choose for practical test, notifying party of the first part in writing where same have been so placed, all of which, however, shall be done by the said trustee in the name of the party of the first part; and party of the first part shall have the right to adopt or reject said improvements upon reasonable trial, and, if rejected by party of the first part, the expense of such improvements shall be sustained by said trustee, and he shall forthwith close the manufacture of all such rejected parts, and shall retake the said machines into his custody. If, however, the party of the first part shall adopt such improvements, then the questions of costs of manufacture, royalty, commissions, and selling price shall be determined by subsequent agreement."

After setting out the contract, the bill avers that, in and by the said agreement, the defendants Crosman, Metcalf, Rollins, and Glazier, and the Lynn Box Machine Company "agree that upon the creation of the trust provided for in the fourth clause, and the acceptance thereof by the said trustee, they should forthwith cease to carry on the business of making, using, or selling box-making machines covered by said patents, or other patents" owned by complainant "except as thereinafter provided;" that the defendant Kilham was in February, 1888, appointed trustee; that he accepted the trust, and entered upon the performance thereof, and that in violation of said agreement the defendants have jointly and severally, the first four as directors of the Lynn Box Machine Company, with the consent of Kilham, carried on the business of making, using, and selling box-making machines of the same kind and character, in principle and mode of operation, as the machines made and sold by the defendants Crosman, Metcalf, Rollins, and Glazier before the commencement of the suits above mentioned, and the making, using, and selling of which were decreed in said suits to be infringements of the patents involved therein, and which they were enjoined from making, using, or selling; and the defendant Kilham, in violation of the agreement and his obligation as trustee, has not only consented to make, use, and sell, but has actively promoted and encouraged the same. The answer admits the foregoing allegation contained in the nineteenth clause of the complaint, except that part in which it is alleged that the defendants have jointly or severally violated their agreement with, or duty to, the complainant. In other words, the defendants admit the facts alleged in the bill, but deny that they constitute a violation of the agreement.

The bill further alleges that the defendants Crosman, Metcalf, Glazier, and Rollins and the Lynn Company have continued to carry on the business of making and selling box-making machinery covered by the Monro single-strip patent and the Inman topping-machine patent in defiance of complainant's rights under the contract, and are aided in doing so by the defendant Kilham. The bill further shows that the defendants have infringed the Monro double-strip patent by making, using, and selling box-covering machines, employing therein the invention patented by that patent, and threaten to continue such infringement; that the defendants falsely pretend to the public that they are licensed by the complainant to make and sell machines embodying the invention patented by the double-strip patent, and that the public have been deceived thereby, and have bought machines from the defendants, the making, use, and sale of which was not authorized by the complainant, and was in violation of its rights, and that the complainant has been greatly damaged thereby; that the inventions patented in complainant's said patents are capable of conjoint as well as separate use in the same machine, and they have been

so used by the defendants; that the defendants' acts have caused great damage to the complainant; that the defendants' continued violation of said agreement will cause the public to disregard the complainant's rights, and especially the complainant's rights to the invention patented by the double-strip patent.

The circular letter of May 25th, referred to in the opinion as being found in the catalogue of the Lynn Box Machine Company, was as follows:

"Amsterdam, N. Y., May 25, 1888.

"To Paper Box Manufacturers: You are hereby informed that all litigation by the American Box Machine Company, of Amsterdam, N. Y., (Horace Inman, vice president and manager,) against the Lynn Box Machine Company of Lynn, Mass., and purchasers of the so-called 'Lynn Box-Covering and Topping Machines,' has been settled by the Lynn Box Machine Company paying to the American Box Machine Company an agreed cash consideration. Hereafter the Lynn topping and covering machines will be sold by the American Box Machine Company in connection with its machinery, and by D. A. Kilham, trustee, or his agent, of Lynn, Mass., who represents the interests of the American Box Machine Company, and who will sell the Lynn machines, and in connection therewith the machines of the American Box Machine Company. In all cases the machines will be billed to purchasers in the name of, and licensed by, the American Box Machine Company. For machines sold by said Kilham, trustee, or his agent, payment will be made to him at Lynn, Mass. American Box Machine Co.

"H. Inman, Manager.
"John B. Rollins, President.
"D. A. Kilham, Trustee.

"Attest: B. Finlayson, Sec. Lynn Box Machine Co."

William A. Jenner, for complainant.
Thomas W. Clarke, for defendants.

PUTNAM, Circuit Judge. The prayer of the bill in this case asks expressly for a specific performance of the contract set out. It also contains some expressions looking to relief as on a bill for infringement of a patent. It is impossible to sustain the bill as one with a double aspect, because, in a bill for an infringement, the determination who are the necessary parties must be made from a different standpoint from that in a bill for specific enforcement of a contract. Other substantial reasons might be given, but it is sufficient to add that, for a bill with a double aspect, the title to relief must be precisely the same in each event, which seems not possible in the class of bills to which this at bar belongs. Story, Eq. Pl. § 254. Unless, therefore, the complainant confesses that this bill is strictly for an infringement, and has arranged parties accordingly, or that it is for a specific performance of a contract, and has arranged parties accordingly, it must be treated as multifarious, though, as the respondents have not made that point, it cannot be dismissed on that account. Nevertheless, the court of its own motion must see that the litigation is put in form to be disposed of understandingly.

The complainant cites the opinion of Judge Shipman in Magic Ruffle Co. v. Elm City Co., 13 Blatchf. 151, as though it justified a double remedy under this bill; but it seems Judge Shipman (page 156) declined to commit himself to that position, and his conclusion was that although the bill was so framed that it might, perhaps, have been considered either as for infringement or for

specific performance, yet, on the whole, it was to be held that the pleader made the alleged breach of agreement the basis of the action, and sought to recover damages for injury arising from a violation thereof. Thereupon Judge Shipman evidently worked out the case as though the bill was founded solely on the contract.

It is also apparent in the case at bar that the respondents accepted the bill as one for specific performance. This is particularly apparent from the method in which they meet the claim that they had not denied infringement, for they point out that the answer denies that respondents, "in violation of the covenant," had made use and sold, etc. So far as the bill is uncertain in this particular, or has a double sound, the respondents were entitled to elect the construction to be put upon it; and the court approves their election. It is only by treating the bill as respondents have treated it that the court can avoid the difficulties which appear in Hartell v. Tilghman, 99 U. S. 547, in White v. Rankin, 144 U. S. 628, 12 Sup. Ct. Rep. 768, and in the other cases therein cited.

This conclusion renders it easy to dispose of the relations to this case of Metcalf as a special partner in Frank & Duston. I see some difficulties in the way of his being made a party defendant to a bill for infringement, without joining his partners, also; but, on a bill for specific performance of a contract executed by Metcalf, I think he can be holden because he is a contractor, although it may embarrass the partnership with which he has allied himself. I think, also, that he cannot be permitted to avail himself of the profits of that partnership in violation of his own contract, and then excuse himself on the ground that his relations as a partner are inactive, dormant, silent, or limited.

It is sufficiently plain that a mere recovery of damages, which is the only remedy the common law affords, would not be an adequate remedy for the complainant in the case at bar, and therefore I must hold that there is jurisdiction in equity to furnish the relief which the complainant desires.

I do not consider it necessary to investigate the mass of evidence bearing on the proposition that the contract at bar was made with reference to a certain existing machine or machines; neither do I concur in the proposition of the complainant that, so far as the contract provided for a license to Kilham, as trustee, it covered only what was expressly claimed in the Glazier patent.

That the contract did not relate to specific machines appears from many expressions in it, apportioning the rights between the complainant and the respondents according to patents, and not according to existing structures. I find not a word in it which refers to the latter, while the sixth clause gives the trustee the right to make, or cause to be made, the single-strip machines, "that embody the inventions, or substantial parts thereof, described in the said patents," meaning the Glazier patents; and this was the only license given to the trustee, or any of the defendants,

under this contract. As to the other proposition, while the mere letter of what I have just cited touches only "the inventions, or substantial parts thereof," described in the Glazier patents, yet it seems a strained construction to deny that Kilham, as trustee, was licensed to make, or cause to be made, the machine as actually shown in the specifications and drawings attached to them. This is the practical interpretation given by the joint circular of May 25, 1888, found on the cover of complainant's Exhibit H, as at least so much as this was covered by the expression "Lynn covering machines," which that circular expressly allotted to Kilham, trustee, or his agent.

It is a simple principle, especially with reference to parties asking a specific performance of a contract by an equity court, that, when it has been varied in the execution of details by common understanding and mutual consent, the change will be insisted on by the court, either as a practical construction, illustrating the original intention of the contract, or as a supplemental agreement. But although, in the case at bar, it appears, and is claimed by the complainant, that the modifications of the respondents' machine complained of were adopted by it immediately after the contract was executed, and although I might, perhaps, find enough in the record, showing that the complainant had slept on its rights, to bar an account or assessment of damages, if the case came to that, yet I am not satisfied that the complainant was properly aware of the course of manufacture, knowingly waived its rights, or has intentionally given any construction to the agreement, except such as it properly bears on its face.

Subject to the possible effect of the above qualifications, it must be held that all parties to the contract agreed in the strongest terms to maintain in the complainant, not only the exclusive right to the peculiar machines described in any of the patents originally owned by it, but also any method of covering boxes with a plurality of strips simultaneously. The portion of the contract which provided that some of the defendants might experiment on the single-strip machine, with a view of converting it into a double-strip machine, on terms to be accepted by the complainant, make especially clear the extent to which that contract intended to go in this direction.

It is apparent, for reasons which are stated at length in the testimony of Inman, that no machine shown by the Glazier patents could be used for a simultaneous plurality of strips, without some adaptation for that purpose. It is also plain that the respondents' machine has been adapted, either intentionally or otherwise, so that now is is capable of the extended use; this coming apparently from the interposition of a circular guide, which operates as a double guide, in lieu of the finger, or single guide, shown in the specifications and drawings of the Glazier patent No. 369,582, and from the omission, in connection with the reversing the frame of the machine, of the weighted lever, m, and possibly in part from the addition of another roller, as shown in complainant's Exhibit A. It is not necessary, however, for the court to

go into these details. It is sufficient that it holds that no machine shown in the Glazier patents was capable of the use of a simultaneous plurality of strips without some change or adaptation, while the machine as sold is thus capable. Of course, respondents cannot be limited to a precise form of machine, so far as concerns mere mechanical details which are not injurious; but what may be allowed, or not allowed, in that direction, will be a matter for consideration when the terms of the final decree are settled.

Complainant's brief enters on a discussion of matters not charged in the bill, as, for example, a claim that the Lynn Box Machine Company be enjoined from making, selling, or using any box-making machinery covered by any of the patents. Indeed, so far as this is concerned, the nineteenth paragraph of the bill alleges that what this corporation has done was with "the consent of the defendant Kilham;" and, as he was authorized by the contract to appoint such selling agents as he saw fit, and was also to procure the manufacture of the single-strip machines by such persons as he deemed proper, subject to being personally responsible for agents not approved by the complainant, it is of no consequence whether his appointment was formal or informal, or by ratification or consent. The pith of the bill aims only at respondents' making, using, or selling a two-strip machine, and, when this call of the bill is met, nothing further remains to be answered for.

It is admitted by the complainant's brief that the Lynn Box Machine Company neither manufactured nor sold the offending machine. There is no proof of any complicity on its part, unless it be by what appears on page 2 of the catalogue of complainant's Exhibit H. There is nothing in the text of this page, and I have not been referred to anything in the proofs, which indicates that the machine there shown was adapted for two strips, or was offered as such, and the drawing is not sufficiently accurate to throw light on that point. Taken in connection with the joint circular of May 25, 1888, which appears in this catalogue, I am unable to see that it furnishes any ground of complaint. I have no doubt of the right of Kilham, trustee, or of his selling agent, Metcalf, or of any other person interested in selling the single-strip machine, to advertise it through the catalogues of the Lynn Box Machine Company, or of any other person or corporation, unless the advertisement is shown to contain some unauthorized feature; and such is not the case with this in question.

I do not find any claim of any act by Crosman, individually, or anything connecting him with this case except as director of the Lynn Box Machine Company, and I therefore think he must go out of the suit with that corporation. Rollins and Glazier are properly charged as the manufacturers, and Metcalf as the seller, of the offending machine, and therefore must be retained in the bill.

It also appears that Metcalf is a special partner in the limited partnership of Frank & Duston, and that this partnership has

been using the machine in question for covering boxes with two strips simultaneously. For reasons already stated, Metcalf must be charged with the acts of the partnership, so far as his obligations under the contract are concerned, but no account can be taken of profits as against him, in the absence of his copartners as defendants in this suit.

In Magic Ruffle Co. v. Elm City Co., supra, Judge Shipman ordered an account of profits; but in the case at bar the complainant has not proven specific facts sufficient to show that any of the respondents have made any profits on account of the features complained of in the machines which they sell; and, while it is very probable that unrestricted sale would eventually seriously impair the trade of the complainant, which fact is the basis of jurisdiction in this case, yet the proofs also lack specific evidence of actual damage already suffered. On the whole I do not find enough in the record to justify ordering an account or making a reference for the purpose of assessing damages.

Let there be a decree dismissing the bill as against Crosman and the Lynn Box Machine Company, with costs, but for the complainant, against the remaining respondents, for an injunction, with costs, and, further, against Metcalf from continuing in the partnership of Frank & Duston, so long as they are using the machines complained of: the terms of the decree to be settled in accordance with this opinion.