## INDIANA MFG. CO. v. J. I. CASE THRESHING MACH. CO.

(Circuit Court of Appeals, Seventh Circuit.    April 16, 1907.)

### No. 1,334.

**1. PATENTS—INFRINGEMENT—SUIT BY OWNER AGAINST LICENSEE.**

A suit by the owner of patents to enjoin a licensee from using any of the patented devices except on the terms imposed by the license contract is not one for the specific performance of the contract, but is one to enjoin infringement of the patents by excluding defendant from that part of the patent domain not granted by the contract, and is maintainable in a federal court of equity irrespective of the validity of the contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 312½.

Jurisdiction of federal courts in suits relating to patents, see note to Bailey v. Mosher, 11 C. C. A. 313.]

**2. SAME—VALIDITY AND SCOPE—PNEUMATIC STRAW STACKERS.**

The Buchanan patent No. 467,476, for a pneumatic straw stacker, covers the uniting of old elements to form a novel and useful combination of a generic character, and its claims are not limited in scope by anything in the prior art. Such patent is dominant in the art, and the patents to Nethery, Nos. 493,734 and 517,475, and to Landis, Nos. 512,553 and 514,266, are for improvements only and subordinate thereto, and the uniting of all in a single ownership is not therefore in restraint of competition.

**3. MONOPOLIES—RESTRAINT OF TRADE—CONTRACTS RELATING TO PATENTED ARTICLES.**

Complainant, which was the owner of a number of patents relating to pneumatic straw stackers, granted licenses to manufacturers of threshing machines by which they were given the right to use any or all inventions covered by such patents and required to sell stackers made thereunder at a stated price and to pay complainant a royalty on each stacker so made and sold. They were also given the right to use the inventions covered by any other patents relating to the art which should thereafter be acquired by complainant, and it did afterward acquire the ownership of practically all patents relating to such stackers. *Held*, that such contracts were not in restraint of competition and in violation of the Sherman anti-trust act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), but were within complainant's right under the patent laws, although all of the manufacturers of threshing machines in the United States became licensees, there being no right in the public to free competition in articles covered by patents.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, §§ 11, 13.]

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

Charles C. Linthicum and W. H. H. Miller, for appellant.
Robert S. Taylor and I. K. Boyesen, for appellee.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges

BAKER, Circuit Judge. The appeal is from a final decree dismissing appellant's bill for want of equity. 148 Fed. 21.

A sufficient outline of the bill is this: Appellant owns certain patents on pneumatic straw stackers; in 1895 appellant licensed appellee for the lives of the patents to make, use, and sell stackers embodying any of the inventions then owned or thereafter acquired by appellant, and used by appellee, on the terms that appellee maintain the price at $250, put on the patent marks, and pay appellant $30 royalty, and that appellant give appellee the benefit of any more favorable terms extended to subsequent licensees; appellee accounted until 1902; in that year appellee sold stackers under the license, but refused to pay $40,000 royalties that accrued; beginning in 1902 appellee made a so-called "Norton stacker," omitted appellant's patent marks, refused to pay royalty on the ground that the Norton stacker did not embody any of the inventions covered by appellant's patents, and threatened to put that stacker on the market at a price less than $250; the Norton stacker did embody inventions covered by appellant's patents; beyond the damage that resulted from infringement, appellee's manufacture and sale of Norton stackers was injuring appellant in this wise: Before and after 1895 appellant had granted similar licenses to other makers; the validity of the patents had been universally recognized; on the patents appellant had built up a valuable property right in its system of licenses; appellee's conduct with respect to the infringing Norton stacker was demoralizing to the system, and, if persisted in, would destroy its integrity. In addition to an accounting, an injunction was prayed to restrain appellee from further making, using, or selling stackers in violation of appellant's rights as stated, or except in strict compliance with the terms of the license.

This is not a bill for the specific performance of a contract. The court is not asked to compel appellee to make and sell stackers under the license, and to see to it that appellee maintains the price, puts on the patent marks, and accurately reports its sales. So far as this bill is concerned, appellee may quit the stacker business any minute it sees fit. What is sought is an injunction against appellee's unlawful invasion of appellant's lawful patent monopoly. If appellee has not invaded, or if the monopoly is unlawful, appellant fails. If appellant had chosen to accept appellee's repudiation of the license, a bill to exclude appellee utterly from the domain of the patents would have lain. By declining to recognize the fact or the right of repudiation, appellant did not estop itself from asking to exclude appellee from that part of the domain which had not been granted, namely, the control of prices and methods. Stripped of all averments in relation to appellant's business built up on licenses, the bill states a good cause of action for infringement of the patents. These averments, as appellant rightly claims, show an aggravation of the injury resulting from the infringement, and constitute, therefore, an additional appeal for injunctive relief. That the bill properly invokes the aid of a court of equity, we have no doubt. Eureka Co. v. Bailey, 11 Wall. 488, 20 L. Ed. 209; Kinsman v. Parkhurst, 18 How. 289, 15 L. Ed. 385; Hardin v. Boyd, 113 U. S. 763, 5 Sup. Ct. 771, 28 L. Ed. 1141; West-

ern Union Tel. Co. v. Union Pac. Rld. Co. (C. C.) 3 Fed. 423, 721; McKay v. Smith (C. C.) 29 Fed. 295; Hat Sweat Mfg. Co. v. Porter (C. C.) 34 Fed. 745; Ball Glove Fastener Co. v. Ball & Socket Co. (C. C.) 36 Fed. 309; Am. Box. Mch. Co. v. Crosman (C. C.) 57 Fed. 1021; Id., 61 Fed. 888, 10 C. C. A. 146; Heaton-Peninsular Co. v. Eureka Specialty Co., 77 Fed. 294, 25 C. C. A. 267, 35 L. R. A. 728; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; Rupp & Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544.

As a reason why it should not be compelled to pay delinquent royalties on stackers confessedly made in accordance with the patents, appellee pleaded that appellant had itself first violated the license contract by extending to subsequent licensees more favorable terms than it granted to appellee. This partial defense we find to be unsupported by the evidence.

We dismiss without notice other partial defenses which are not established by the evidence, or which, if sustained by any proof, were not pleaded. Rubber Co. v. Goodyear, 9 Wall. 788, 793, 19 L. Ed. 566.

Answering the charge in relation to the Norton stacker, appellee denied that that stacker embodied any invention of any of appellant's patents. The validity of the patents was not questioned in the answer; but appellee, through its expert, brought into the evidence a very large number of prior patents with a view to limiting the claims relied on to less than their prima facie import. If this may not properly be taken as an admission that the Norton stacker infringes unless the claims be thus stripped of some of their apparent meaning, it nevertheless accords with the fact; for, in our judgment, the differences between the Norton stacker and the claims relied on, taking them as they read, are not even colorable enough to require discussion. So the question at this point is whether the prior art depreciates the face value of the claims.

The claims to be considered in the Buchanan patent, No. 467,476, January 19, 1892, are these:

"(1) The combination, in a pneumatic straw elevator and stacker, of the fan, the base portion C, and an upper portion D, hinged thereto, the adjacent ends of said two portions being fitted one within the other, whereby a sliding union is provided as the relative positions are changed, thus permitting one portion to be elevated relatively to the other. while still maintaining a substantially air-tight relation between said two parts, substantially as set forth."

"(5) The combination, in a straw elevator and stacker, of the two portions C and D, united by a hinge or pivot, and a rope E, secured to the lower portion at one end, passing around the sheave on the upper portion, and returning to a windlass, also secured to the lower portion, substantially as shown and described.

"(6) The combination, with a pneumatic straw elevator and stacker, of a mouth portion hinged thereto, having an inclined upper side and an open under side, and means whereby said mouth portion may be adjusted to a desired position, substantially as set forth.

"(7) The combination, with a pneumatic straw elevator and stacker, of a mouth portion $D^2$, hinged thereto and adjustable thereon from a position substantially in line with the main portion of the stacker to a position at an angle therewith, whereby the direction the straw takes at the point of discharge may be controlled, substantially as shown and described."

"(9) The combination, with a threshing machine, of a pneumatic straw ele-

vator and stacker attached thereto, as described, and a fan located within the machine and communicating with said straw elevator, said fan being arranged centrally of said machine and arranged to take its supply of air from the interior of the machine, thus drawing into itself the dust caused by the operation of said machine and discharging said dust into the straw, substantially as set forth."

Straw may be dumped into a heap and allowed to rot; or, if treated as a valuable product, it may be built into a compact, symmetrical stack, practically impervious to weather conditions, and thus preserved for future use. Prior to the advent of the Buchanan stacker, mechanical conveyors had carried the straw from the separator to the men who built the straw stack. So far as this record shows (and the whole world has apparently been ransacked to produce its bulky volumes), the patent of 1892 first disclosed a conception of means to free mankind from this most disagreeable and arduous manual task. Here was a new result, of the first order of importance. The utmost that any previous machine had done was to save the labor of getting the straw to the men who arranged it with their pitchforks and tramped it to solidity. This machine, with its fan for creating the blast that forces dust and straw out through an air-tight pipe; with its turntable joint at the base of the pipe, for lateral movement; with its substantially air-tight joint between the base and upper sections of the pipe, for vertical movement; with its adjustable mouthpiece at the outer end of the pipe, for controlling the direction and packing the blast-driven straw; with its appliances for giving universality of movement to the pipe and for directing the mouthpiece; all under the hand of a single operator—built straw stacks. The prior art is rich in fans, turntable joints, flexible pipe joints, air-tight pipes, mouthpieces and nozzles, sheaves, ropes, and windlasses, used in many connections and for many purposes; but Buchanan never claimed that he was the creator of any of these. The record exhibits many mechanical conveyors. They did well their work of saving the labor of the men who pitched the straw from the ground to the men on the stack; but the immense trade in them has been totally lost to the higher-priced machine that relieves both the men on the ground and the men on the stack. The Brinsmead British patent, No. 218 of 1868, shows the combination of a fan and a pipe that is capable of being raised and lowered. That this was merely a pneumatic conveyor is sufficiently indicated by the pictures of the machine in operation, wherein a prominent feature is men on the stack with pitchforks in operation. The history of that machine has been traced. It never achieved success for its limited purpose, and long ago was numbered with the dead. Buchanan's patent No. 297,561, April 29, 1884, may prove that eight years before he reached the goal he perceived the benefits that would come from stacking straw pneumatically; but it shows clearly that he then lacked the conception of means to accomplish the desired result.

The claims are for combinations of admittedly old elements. The combinations were novel and useful, and involved unquestioned invention. The result was not merely new in degree; it was new in kind. Buchanan did not improve upon some one else's generic combination; he brought forth something theretofore nonexistent as certainly as

if he had produced a new element in the useful arts. Having evolved the conception of means to effect the new result, he found a variety of forms of the necessary elements from which to select, some alone and some in partial combination. The prior art evidence, without basis in the answer, therefore assails the inventiveness of the claims rather than their scope. But the act of the inventor consisted of picturing in the creative imagination the new result, the new machine for achieving it, and the way to build the machine, rather than of the selection and rearrangement of the elements of dredges or of grain elevators or of straw conveyors, for "form, location and sequence of elements are all immaterial, unless form or location or sequence is essential to the result, or indispensable, by reason of the state of the art, to the novelty of the claim." Adam v. Folger, 120 Fed. 260, 56 C. C. A. 540, and cases cited. Against the pneumatic stacker of Buchanan's 1892 patent, the supplanted mechanical conveyors and the unsuccessful pneumatic conveyors are as nugatory as were the Hunt and Kelly barbed wires against the Glidden wire. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 450, 36 L. Ed. 161; Consolidated Safety Valve Co. v. Crosby Valve Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939.

Little need be said of the other patents. They involve improvements upon one or another essential feature of the pneumatic stacker. Claims 1 and 2 of the first Nethery patent, No. 493,734, March 21, 1893, call for a fan positioned flatwise within or under the rear end of the separator, with its eye upward, and a hopper to guide the straw and dust into the eye of the fan. Claims 1 and 2 of the second Nethery patent, No. 517,475, April 3, 1894, provide a construction whereby the stacker may be more conveniently applied to a threshing machine already built, and means whereby the pipe, with its appliances for universal movement, may be mounted directly upon the turntable. Claim 1 of the first Landis patent, No. 512,553, January 9, 1894, exhibits a fan of the first Nethery patent, with a continuous web-plate to prevent the straw from coming into contact with the adjacent surfaces of the fan casing, thereby lessening friction and facilitating the discharge of the straw. Claim 2 of the second Landis patent, No. 514,266, February 6, 1894, discloses an improved mouthpiece whereby a greater range of distribution is afforded and the scattering of the straw by side winds is prevented. We find that the Buchanan patent of 1892 is dominant and the Nethery and Landis subordinate. But if the five be regarded as mere improvements upon the expired Brinsmead of 1868 and Buchanan of 1884, the fact that they are well adapted to conjoint use is established by appellee's way of making an up to date stacker.

The remaining matter in the answer is this: Appellee "submits" that its contract with appellant is a part of a license system which is violative of the Sherman Law, Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]. If this is a mere interrogatory propounded to the court, and not a joinder of issues of law or of fact or of both, appellee is not entitled to a further hearing. We will treat the submission, however, as taking issue with respect to the existence of a binding contract, and thus afford appellee a standing in court

while the question of the extent of the relief that should be granted to appellant is being considered.

Appellee is using the patents. Its answer that it has no license to do so does not meet the prayer that it be enjoined from using the patents except in accordance with the license. If there be no license, an injunction, even in the form prayed for, will prevent appellee from using the patents for the future. The answer of no license, however, does reach the question of damages for the past. One way, royalties; the other, profits, etc. Appellant demands royalties. And throughout the valid relationship of licensor and licensee, appellant has the right not only to royalties, but also to appellee's silence respecting the validity and prima facie scope of the patents. Siemens-Halske Electric Co. v. Duncan Electric Mfg. Co., 142 Fed. 157, 73 C. C. A. 375.

Appellant (treating it as standing from the beginning in the shoes of the patentees) commenced to manufacture pneumatic stackers in 1891. The stacker had to be built into the separator. During 1891 36 stackers were built into 19 different makes of separators. In 1892 Gaar, Scott & Co., large manufacturers of threshing machinery, applied for license to build stackers into their own separators at their own factory. That license fixed the royalty at $30 and the selling price at $250, the same that appellant exacted from its own customers; provided that the licensee should be entitled to use all patents subsequently acquired by appellant, without additional royalty; and gave the licensee the benefit of any better terms that might subsequently be granted to others. By 1895 nearly all of the makers of threshing machinery had applied for and received, on the terms granted to Gaar, Scott & Co., licenses to build the stackers into their own separators at their own shops. Meantime appellant, at its own shops, continued to supply the demand for stackers to be built into old separators. Since 1895, the different makers being then willing to put stackers into old as well as into new separators, appellant has not been building stackers for the trade. As patents for improvements were issued from time to time appellant bought them up, in the main, until now it owns practically all of the patents that pertain to this art.

One attack upon appellant's license system is based upon the number of licensees. All the makers of threshing machinery have come into the system. That this resulted, without any concert of action on the part of the licensees, solely from a policy pursued by appellant through a course of years, is virtually admitted and is clearly proven. Appellant started out to supply the trade. That was its exclusive right. It committed no offense against the public in establishing the price at $250. The public could not force it to license another to make its device. If it had stopped with the first license to Gaar, Scott & Co., appellee apparently concedes that the Sherman law would not have been violated. But have not the people been given something beyond their power to demand, in a policy that permits a customer to get a stacker as a part of the separator of his choice, not merely in connection with a favored separator? The contracts and the businesses of these licensees are separate. But if, as a condition of enjoying the inventions, appellant had required the licensees to form a pool or combination for controlling the price and output of the patent-

ed article, the public would not have been injured, and consequently the Sherman law would not have been violated.  Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co. (herewith decided) 154 Fed. 358.

Another attack is predicated upon the number of patents.  The proposition is that the public is entitled to competition between independent inventions.  The linotype and the monotype inventions are referred to as illustrating machines that produce the same result by essentially different means and modes of operation.  If Buchanan had invented the linotype, the patent laws would have given him a monopoly, not a lesser right conditioned upon his giving the public the benefit of his invention in a way some chancellor might deem equitable (Fuller v. Berger, 120 Fed. 274, 56 C. C. A. 588, 65 L. R. A. 381, denying the doctrine of Hoe v. Knap [C. C.] 27 Fed. 204), but an absolute monopoly, an unqualified right to deprive the people of its use for 17 years (and the writ of injunction of course affords the only possible way) or to make them pay his price in the meantime. Would he by conferring upon the public the advantage of that disclosure be barred of the right to make or buy the monotype invention? We do not understand counsel for appellee to say "yes" squarely.  But their contention comes to this:  If he owned either alone, over that he would have complete dominion; owning both, he controls nothing.  The public has no right in either invention; therefore the public has the right to have them both in the market competing for buyers.  Naught plus naught; the sum of two naughts is a substantive quantity.

If we are mistaken in our view of the prior art and in attributing primacy to the Buchanan patent of 1892; if the foundation patent be either the Brinsmead of 1868 or the Buchanan of 1884; and if the patents in suit be only for independent improvements upon a successful stacker that was free to the public—the argument of counsel respecting the lawfulness of the concentration of the patents in the hands of a single company is covered fully by the opinion of the Supreme Court in United States v. American Bell Telephone Co., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144.  With a quotation from that, the analogies being noted in parentheses, we close:

"Much is said in the briefs and in the arguments about the practical continuance of the telephone (stacker) monopoly.  It is well to understand exactly what is meant thereby.  No one questions that the Bell patent (the Brinsmead or the Buchanan of 1884) has expired, and that all of his invention is free to the use of the public.  It is not denied that Berliner's invention (Buchanan's of 1892) is something independent and distinct from the Bell (Brinsmead) invention.  It is the combination of these inventions (the Brinsmead, the Buchanan of 1884, and the Buchanan of 1892) with those of Blake and Edison (Nethery and Landis) which makes the instrument in commercial use, and because this is the most serviceable it is the one that the public insists upon having.  But each invention has independent rights.  It loses nothing because when united with another it results in an instrument more valuable than either alone will give.  Suppose that at the expiration of this Berliner (Buchanan 1892) patent some new invention shall be made by which in connection with those already free to the public an instrument can be manufactured far surpassing in utility that used today, and the Bell Company (appellant) shall purchase that invention; the public, which always insists on having the best and most serviceable, will undoubtedly take the new instrument, and in that way it may happen that what is called the telephone (stacker) monopoly is practically still further continued.  But surely that does not abridge the legal rights of any one.

The inventor of the latest addition is entitled to full protection, and if the telephone company (appellant) buys that invention it is entitled to all the rights which the inventor had. All that the patent law requires is that when a patent expires the invention covered by that patent shall be free to every one, and not that the public has the right to the use of any other invention, the patent for which has not expired, and which adds to the utility and advantage of the instrument made as the result of the combined inventions."

The decree is reversed with the direction to enter a decree in appellant's favor in accordance with the prayer of the bill.

GROSSCUP, Circuit Judge (concurring). The ground on which I wish to put my concurrence, so far as the case involves the Sherman Act, is this: The Buchanan patent is a true combination patent, of which the Nethery ·and Landis patents are improvements only, and subsidiary thereto—so much so that they could not have been put into practice except by infringement of the Buchanan patent. The patents as an entirety, therefore, constitute a single mechanical evolution—are blossoms from the same trunk—and in no sense are competitive patents; from which it follows that their concentration in one control is in no sense a combination to prevent competition. I state this as my view because I am not prepared to hold—as I have said already in a concurring opinion in Rubber Tire Wheel Company v. Milwaukee Rubber Works Company—that patented articles are never, under any circumstances, articles of trade or commerce, within the Sherman act.