COMPTOGRAPH CO. v. BURROUGHS ADDING MACH. CO. (two cases).

(Circuit Court of Appeals, Seventh Circuit. October 14, 1910. Petition for Rehearing Overruled November 18, 1910.)

Nos. 1,674, 1,679.

PATENTS (§ 214*)—LICENSES—GROUNDS FOR CANCELLATION—REPUDIATION OF CONTRACT BY LICENSEE.

The fact that a licensee under a patent for the full term of its life, under a contract which he has fully executed by payment of the agreed consideration, although he was to pay further royalties if the patent was sustained in an infringement suit brought by the licensor against a third party, by leave appeared by counsel in the appellate court in such suit and filed a brief in aid of the defendant, attacking the validity of the patent, did not constitute a repudiation of the license contract which entitles the licensor to its cancellation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 321–327; Dec. Dig. § 214.*]

Appeals from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suits in equity by the Comptograph Company against the Burroughs Adding Machine Company. From a decree (175 Fed. 787, 792) in each case dismissing the bill, complainant appeals. Affirmed.

The bill, No. 1674, was to restrain infringement of letters patent No. 628,-176, issued to Dorr E. Felt, July 4, 1899, for a Tabulating Machine; to which appellee pleaded that it was licensed under said patent, and, on account of said license, could not be held for infringement—counsel for appellant stating upon the record that appellant would not claim that appellee had infringed any of the claims of the patent in suit other than those covered by the plea; and upon this plea issue was joined, and proof had. The decree appealed from held that the plea was proved, and dismissed the bill for want of equity.

The bill, No. 1679, was for cancellation of the license above mentioned; to which a general demurrer was filed, which, upon hearing, was sustained and a decree entered dismissing the bill. Practically, the same questions are presented on the appeals in both cases. The two appeals will, therefore, be considered together in this opinion. The facts are stated in the opinion.

John W. Munday, for appellant.
Edward Rector and Robert H. Parkinson, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion:

The patent, involved in these suits, was before this Court in the case of the Universal Adding Machine Company v. Comptograph Company, 146 Fed. 981, 77 C. C. A. 227, and was held invalid on the ground that it was either anticipated by the Hiett and Cable patent, which had been issued before this patent was applied for, or that, accepting the contention that the invention was conceived in 1890, so as to carry the concept back of the Hiett and Cable patent, the same had been abandoned by non-use. The correctness of that decision is not involved in this case; nor is any evidence brought into this case that was not in that case, except as it may bear upon the question of whether the license agreement of January 20th, 1904,

has been renounced, repudiated, or forfeited by the conduct of appellee and its counsel in that case, as contended for now by appellant.

The original license agreement is admitted. The contention is that it has been renounced. The agreement, as executed, after reciting that appellant is the owner of the letters patent above described, relating to adding machines equipped with transversely-movable wide-frame paper-carriages, and that appellee's assignor, the American Arithmometer Company, had been and was then engaged in the manufacture and sale of adding machines employing transversely-movable wide-frame paper-carriages, claimed by the appellant to embody a material part of the invention patented, in consideration of the payment of the sum of $5000 in cash by the American Arithmometer Company to appellant, releases and discharges the said American Arithmometer Company, its agents and customers, from all claims whatsoever, growing out of said letters patent, on account of the machines manufactured by the said American Arithmometer Company prior to the first day of January, 1904; and grants to the said American Arithmometer Company an exclusive license, except as against appellant's right to manufacture, use and sell such machines, for the full term of the patent. The agreement then further provides as follows:

"3. Said first party (appellant) agrees to promptly bring suit upon said letters patent against existing and future infringers thereof, and to diligently and vigorously prosecute such suit or suits to a final determination, for the purpose of judicially determining the scope and validity of said letters patent and of suppressing infringements thereof and securing a monopoly of said invention to the parties hereto.

"4. Said second party (American Arithmometer Company, appellee's assignor) agrees, upon the terms and conditions herein specified, to pay the first party the following royalties upon all machines embodying the invention described and claimed in said letters patent which said second party may manufacture on and after the first day of January, 1904, and during the full term of said letters patent, and all re-issues and extensions thereof:

"a. On all machines manufactured by the second party during the pendency of the first suit of the aforesaid litigation, and prior to a final determination thereof, the sum of one dollar per machine.

"b. On all machines manufactured by the second party after a final determination of the first suit of said litigation which shall result in an adjudication establishing the validity and scope of said letters patent in such manner as to control and monopolize under it all adding machines employing transversely-movable wide-frame paper-carriages of the general nature and purpose of the machines now being manufactured by the parties hereto, the sum of ten dollars per machine until an aggregate royalty at that rate of the sum of two hundred thousand dollars shall have been paid by the second party to the first party.

"c. On all machines manufactured by the second party after the payment of said sum of two hundred thousand dollars, and during the remainder of the term of said letters patent and· any re-issues and extensions thereof, the sum of five dollars per machine.

"5. Said second party agrees to pay the first party a minimum sum of ten thousand dollars prior to a final determination of the first suit of the aforesaid litigation, on account of the royalties provided for in clause 4 hereof, but the payment of five thousand dollars upon the execution of this instrument, as hereinbefore provided, shall be considered a part of and an advance payment upon said sum of ten thousand dollars. Said final determination of the first suit shall be secured, if possible, on or before December 31, 1905, but if not had by such date party of the second part shall be relieved of the

payment of any royalties whatever upon any machines manufactured by it between December 31, 1905, and the date when such final determination shall be had."

After making provision for the keeping of true, full and accurate accounts by appellee's assignor under the license, with prompt remittance for royalties due thereunder, the license agreement further provides:

"7. This contract is based upon the assumption that the aforesaid letters patent are good and valid in law, and that they can be and will be sustained by the courts and given a construction which will secure to the parties hereto a substantial monopoly of the manufacture, use and sale of all adding machines employing a transversely-movable wide-frame paper-carriage, and is to be construed and enforced between the parties accordingly; and if, as a final result of the litigation hereinbefore mentioned, or as a final result of any subsequent litigation upon said letters patent, said letters patent shall be declared invalid or shall be so construed by the court as to fail to substantially cover and control all adding machines employing such transversely-movable wide-frame paper-carriages, then, and in such event, said second party shall have the right to surrender this agreement and license and be relieved of any further obligations thereunder."

Under this license agreement, appellee and its assignor has paid appellant $12,209, which, admittedly, covers all the royalties due or claimed to be due thereunder, at the time that the conduct took place which is said to have been a repudiation, renunciation or forfeiture, upon the part of appellee, of the license; and up to that time, too, appellee is admitted to have fully performed all its obligations to appellant under the license contract.

The conduct of appellee, urged as a repudiation, renunciation or forfeiture of the license, was the filing of a brief by appellee's counsel in this Court, on behalf of appellee, in the suit of appellant against the Universal Adding Machine Company, supra, brought by appellant pursuant to, and in accordance with, the terms of the license contract, and determined first in favor of appellant in the Circuit Court, and subsequently, on appeal, against appellant in this Court, as above stated; the brief being filed by leave of this Court, obtained upon application of counsel for appellee, of which due notice was given to the parties in the then pending case, including counsel for appellant.

The record before us does not disclose any intention, upon the part of appellee, in the filing of that brief, to consciously repudiate, renounce or forfeit the license contract; on the contrary, it was clearly stated that they were appearing as persons interested in the license contract and under the terms of that license. The record does not disclose that appellee took any part in the making of the record in the case of the Universal Adding Machine Company v. Comptograph Company. So far as anything going into the record was concerned, in the way of facts upon which the judgment of the Court was to be invoked, nothing was either added or subtracted by the brief filed by appellee. The conduct of appellee was confined to an interpretation solely of that record for the benefit of the Court. There is nothing in the record before us showing that the appearance of appellee, by brief, resulted in the appellant's changing its position

in any respect; all that appellant did, after appellee's brief was filed, was to write a letter to appellee, stating that it took the filing of that brief as a repudiation and renunciation of the license; to which no reply was sent. True, appellee in its brief interpreted the evidence as showing facts different from the interpretation put upon the same evidence by appellant; and true, also, appellee, in its brief, stated the law applicable to the evidence differently from the law as stated by appellant; but, unless a licensee, situated as this licensee was, must remain silent at the peril of losing his license, even though, thereby, the Court may be misled into misinterpreting the facts or misapplying the law, this appellant has set up no sufficient answer to the plea of appellee in case No. 1674, nor has it set out in its bill, in case No. 1679, facts which would warrant a court of equity in decreeing cancellation of the license contract. Is it, therefore, the doctrine of the law that a licensee, situated as this licensee was situated, may not inform the Court of its views as to what interpretation should be put upon the evidence, and what application should be made of the law (having had no part in the making of the record), except at the peril of losing its license?

We think not. No case is called to our attention that applies the doctrine, that a licensee or tenant may not deny the landlord's title, to cases like this. Indiana Mfg. Co. v. J. I. Case Threshing Machine Co., 154 Fed. 365, 83 C. C. A. 343, is cited, emphasis being laid upon the sentence in that case that the patentee has the right to the licensee's "silence respecting the validity and prima facie scope of the patent." But in that case, the licensee was in default on its contract, and was refusing to pay the stipulated royalties on the ground that the patent was invalid; the Court simply holding, that in such a suit, to enforce the contract, the patentee, like the landlord, was entitled to have the case heard, as if the contract, as between the parties thereto, was conclusively presumed to be valid and binding. Willison v. Watkins, 3 Peters, 43, 7 L. Ed. 596, was the case of a plaintiff seeking to obtain possession of land, which had been in the possession of the defendant and his father continuously for over thirty years—five years adverse possession under the law of the state being sufficient to defeat the landlord's title—and defendant, during all that time, having refused to admit that he held under plaintiff's title. The Court held that such adverse possession defeated plaintiff's title, and dealing with the limitation within which the suit must be brought, used the language quoted by appellant, to-wit:

"If the tenant disclaims the tenure, claims the fee adversely in right of a third person or his own, or attorns to another, his possession then becomes a tortious one, by the forfeiture of his right. The landlord's right of entry is complete, and he may sue at any time within the period of limitation; but he must lay his demise of a day subsequent to the termination of the tenancy, for before that he had no right of entry."

But the "disclaimer" or "attornment to another," here spoken of, is, of itself, a breach of the tenant's contract relations with the landlord, if any such relation once existed—a breach, too, that if persisted in for a sufficient length of time would transfer, by operation of law, the title from the landlord to the tenant, and for that reason

alone gives a right of action to recover possession the moment it occurs. Steam Cutter Company v. Sheldon, 22 Fed. Cas. 1161, was a license to use a patented invention in a single machine in the licensee's quarry, and nowhere else; provided, however, that additional machines might be used upon the payment of certain additional stipulated sums. Covering the single machine to be used in the quarry, the royalty was paid, and thereby the license fully performed; but without paying the additional sums, the defendant undertook to use additional machines and thereupon was sued for infringement; the Court holding that the license contract was divisible, the portion relating to the single machine in the quarry becoming absolute upon the payment of the stipulated royalty, and the portion of the contract relating to possible additional machines being merely options that, upon failure of acceptance by payment when the machines were used, constituted such use of the machines, independently of the original machines, infringements of the plaintiff's patent. Certainly, no such proposition as •appellant contends for here, was involved in that case.

The true principle, it seems to us, is set forth by the Supreme Court in Blight's Lessee v. Rochester, 20 U. S. 547, 5 L. Ed. 516 (partly quoted by appellant). The attempt there was to apply the principle of legal policy, that forbids a party denying the title under which he has received a conveyance, to vendor and vendee. That principle of legal policy is stated as follows:

"If he is bound in law to admit a title which has no existence in reality, it is not on the doctrine of estoppel that he is bound. It is because, by receiving a conveyance of a title which is deduced from Dunlap, the moral policy of the law will not permit him to contest that title. This principle originates in the relation between lessor and lessee, and so far as respects them, is well established, and ought to be maintained. The title of the lessee is in fact the title of the lessor. He comes in by virtue of it, he holds by virtue of it, and rests upon it to maintain and justify his possession. He professes to have no independent right in himself, and it is part of the very essence of the contract under which he claims that the paramount ownership of the lessor shall be acknowledged during the continuance of the lease, and that possession shall be surrendered at its expiration. He cannot be allowed to controvert the title of the lessor, without disparaging his own, and he cannot set up the title of another without violating that contract by which he obtains and holds possession, and breaking that faith which he has pledged and the obligation of which is still continuing, and in full operation."

Or, to put the doctrine on a more practical basis, where suit is brought by the landlord against the tenant to enforce the landlord's title, recognized in the contract under which the tenant obtained possession, the Courts will not, at the instance of, or as a matter of defense by the tenant, put the landlord in the position of proving his title before he can collect his rent—the tenant, in the meantime, remaining in a position where he may eat off of the stock, while the title of the one who gave him the stock is being settled.

But neither the moral policy, nor the practical consideration, on which this doctrine is founded, is present in this case. The suit in which appellee appeared by brief was not the case of the licensor against the licensee to enforce the contract. No license money was due under the contract. There was no refusal to pay license mon-

ey. There was no putting of the licensor, as against the licensee, to prove his title while the licensee was eating off the stock. There was no·reason or moral policy why the brief should not be filed. Indeed, appellee was standing squarely upon its contract with the appellant. It had, as assignee of the American Arithmometer Company, settled and paid up for all past infringements; it had settled and paid up for all royalties thus far accrued; it agreed that in case the patent embodied a substantial monopoly of adding machines employing a transversely-movable wide-frame paper-carriage, and after such monopoly had been judicially determined, it would pay additional royalties. These royalties were large; the monopoly itself, if upheld, was extremely valuable; and the question whether the monopoly had been judicially determined, was, therefore, a matter of deep consequence to appellee. Why may not the appellee, without violation of its contract, or violation of any ethical duty it owes to appellant, contribute toward clarifying the vision of the Court by which this judicial determination is to be made both right and final? We see nothing in the conduct of appellee that is a renunciation, repudiation or forfeiture of its contract; on the contrary we see simply a precaution upon its part that the judgment of the Court, upon which its additional obligations and its additional advantages alike depend, shall be as free from error as a full discussion of the record before the Court can make the judgment, that is to follow, free from error.

The decree of the Circuit Court is affirmed in each csae.