## STANDARD STOKER CO., Inc., v. BREWSTER.

(Circuit Court of Appeals. Seventh Circuit. September 8, 1921. Rehearing Denied November 15, 1921.)

No. 2911.

Patents ⚙︎214—Inadvertent delay in payment of royalty held not to warrant cancellation of license contract.

Under a license contract for use of an invention, providing that it might be canceled by the licensor for failure to make payment of royalties as agreed upon, and at the times specified, where the licensee had expended a large sum and three years' time in perfecting the invention before it was commercially successful, and had invested $1,000,000 in the undertaking, the licensor *held* not entitled to cancel the contract because, through inadvertence, and not intentionally, a payment of royalty was delayed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Standard Stoker Company, Inc., against Morris B. Brewster. Decree for defendant, and complainant appeals. Reversed.

Frank Parker Davis, of Chicago, Ill., for appellant.
W. H. Lippencott, for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. This is an appeal to test the correctness of a decree of the District Court, dismissing the bill of appellant, hereinafter known as the Stoker Company, filed June 2, 1919, against appellee, hereinafter known as Brewster, to procure the reinstatement of a license contract canceled by Brewster because of failure to pay royalties.

On February 18, 1905, Brewster made a contract with the N. L. Hayden Manufacturing Company. The Hayden interest passed through several hands and finally came to the Stoker Company in 1912. There were frequent controversies, none of which seems to have been finally disposed of, but, as the only provision in the contract for its cancellation is that "in the event of a failure * * * to make payment of royalties as herein agreed upon and at the times herein specified," we do not deem it necessary to consider the merits of those controversies.

The contract, after providing for a royalty of $25 per stoker on the only kind made, contained the following:

"The payment of said royalties shall be made to said first party on the 1st days of March, June, September, and December, respectively, of each· year during the life of this contract, or within ten days after said dates; the amount of such payments shall be based upon written statements setting forth the sales for the previous three months' business, said statements to be submitted to said first party by said second party on the respective dates above mentioned, and to be made from properly kept accounts of the said second party, which said accounts shall at all times be open to the inspection of the first party or his duly authorized representatives.

⚙︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"It is further understood and agreed that during the first year of this contract, beginning with March 1, 1905, the minimum amount of the royalty, or sum in lieu of royalty, to be paid said first party, shall not be less than $200, and during the second year, the sum thus paid said first party shall not be less than $400; during each succeeding year of this contract, the minimum amount of royalty, or sum paid in lieu of royalty, shall not be less than $1,000, the deficiency, if any, to be due and payable at the end of each year respectively."

The contract was taken over by the Stoker Company through an arrangement with Brewster. Nothing had been done up to that time. In 1912 the stoker was tried out, but would not work until after it was redesigned by the Stoker Company's engineer. Those experiments cost $20,000. By March, 1915, 19 stokers had been built, and about $100,000 had been expended, but the business was not on a paying basis. Brewster's letter of July, 1913, shows that there were still serious difficulties to be experimented with before the stoker could be made a commercial success. Up to the time of the cancellation of the contract on January 10, 1919, the Stoker Company had invested a million dollars in the undertaking. During the years 1913, 1914, and 1915 the royalties did not equal $1,000, and at the end of each year, before March 1st, $1,000 was paid in a lump sum.

The report of April 5, 1916, showed that from March 1, 1915, to March, 1, 1916, 43 stokers were sold, making the royalty exceed the minimum by $75, which was paid on that date. Some fault was found with the vouchers, because they said payments were "in full," and Brewster returned them. On April 3, the Stoker Company wrote Brewster:

"We have been paying the $1,000 minimum fee annually, which was as we understood you desired it. * * * From your letter we observe you now prefer this $1,000 * * * paid quarterly. That there may be no misunderstanding upon this point, you will please confirm what we now understand to be your wishes."

No attention whatever was paid to that request, but a long letter was written on April 10, 1916, about other matters. Quarterly payments, of $250 each, were made May 27, September 1, and December 5, 1916, and March 10, 1917, and on March 15, 1917, an additional $75 was paid, covering all stokers sold to March 1. The next year, March 1, 1917, to March 1, 1918, quarterly payments were made June 5, September 17, and November 21, 1917, and March 2, 1918. On March 7, 1918, an additional $1,000, covering all royalties over the minimum, was paid. In 1918 quarterly payments were made June 10 and September 4.

On September 12, 1918, Brewster wrote:

"There is nothing in the contract that justifies you in assuming that there may be a minimum amount of royalty due at the end of a quarter, a balance to be held over. The reference to a minimum payment is simply that at the end of each quarter there is due me $250, even though your sales have not exceeded 10 in number."

Because of illness of the manager and absence of other officers that letter was not promptly answered. On September 23, 1918, $1,675 was sent. On November 29, 1918, $1,450 was sent. The report of

December 2, 1918, showed 107 stokers sold and check for $425 sent on December 10. In the letter it was said that 90 went to the government, and that payment would be made in due course. On the advice of his attorney, Brewster returned that check, and asked them to send check for the 107 stokers. On January 7, the $425 check was returned to Brewster, and one for $2,250 was also sent. Through some misadventure that letter was addressed to Brewster at 1716 *East* 103d street, instead of 1716 *West* 103d street. There was no such number east, and, though delayed, the letter reached Brewster on January 14, 1919; but it had arrived in Chicago on the 9th of January. On January 10, 1919, Brewster wrote the letter of cancellation.

We are of the opinion that there was no willful or intentional delay in making remittance. The method of payment was changed at least twice, and when the Stoker Company asked for a verification of a stated method Brewster ignored the request. Until the business got large, and war conditions made the Stoker Company short on man power, payments were made in advance of specified dates. Carey, the manager, also fell sick.

We are also of opinion that neither party correctly construed the contract as to payment of royalties. Reports should have been rendered on the 1st day of each March, June, September, and December, showing all stokers sold during the preceding three months, and on or before the 10th day of each of said months $25 should have been paid for each stoker sold during that period. If at the end of the year (third year and after) $1,000 had not been paid, then enough should have been paid at the end of each year to make the minimum for the year $1,000. Brewster was not entitled to quarterly payments of $250, regardless of the stokers sold, nor was the Stoker Company entitled to withhold until the end of the year all over $250 per quarter. To permit the cancellation of the contract to stand would be under all the circumstances inequitable and unjust.

The decree of the District Court is reversed, with directions to enter a decree in harmony with this opinion.