## HAZELTINE RESEARCH CORPORATION et al. v. FREED–EISEMANN RADIO CORPORATION.

(District Court, E. D. New York. September 3, 1924.)

No. 1485.

1. **Reformation of instruments** ⊙⇒45(2)—**Evidence held to show all parties understood license agreement contemplated royalty on selling price of set, and not on part thereof.**

Evidence *held* to show that all parties understood that license to use invention contemplated payment of royalty on selling price of radio set, and not on part thereof, and that there was no fraud or mistake.

2. **Patents** ⊙⇒214—**Burden on plaintiff to prove that sublicense contract should be canceled.**

Burden is on plaintiff to prove by fair preponderance of evidence that sublicense to use invention should be canceled for nonpayment, or delay in payment, of royalties.

3. **Patents** ⊙⇒214—**Clear and satisfactory proof required to show forfeiture or repudiation of contract.**

Though proved repudiation or forfeiture of license from patentee may not be excused on grounds of size of business or hardship imposed on defendant, court should require clear and satisfactory proof of forfeiture or repudiation in suit to cancel.

4. **Patents** ⊙⇒219(1)—**Courts of law have exclusive jurisdiction, where issue solely nonpayment of royalty under license contract.**

License contract to use invention consists of right to use and compensation for right, and where issue is solely one of unpaid royalty, courts of law have exclusive jurisdiction and can give adequate remedy.

5. **Patents** ⊙⇒214—**Nonpayment of royalty under license agreement showing intent not to practice invention entitles licensor to cancellation of license.**

Where nonpayment of royalty by licensee shows, with other facts, intention not to practice invention, real purpose of license agreement is repudiated, and licensor is entitled to cancellation of license.

6. **Contracts** ⊙⇒318—**Forfeitures not favored in equity.**

Equity does not favor forfeitures.

7. **Patents** ⊙⇒214—**Court should consider whether, under facts, cancellation of license contract would be unjust and inequitable.**

Even after hearing facts and aside from burden of proof being met, court should consider whether it would be inequitable and unjust to permit cancellation of license contract for use of invention.

8. **Patents** ⊙⇒214—**Delay in payment of royalty pending negotiations for annual lump sum royalty held not repudiation of license agreement.**

Delay in payment of royalty, under license agreement which did not reserve right to cancel for nonpayment, in negotiating for annual lump sum royalty, instead of royalty on each set manufactured, *held* not repudiation of license agreement warranting cancellation, even though as part of negotiations licensee wrongfully withheld information from licensor.

9. **Patents** ⊙⇒214—**Acceptance of overdue royalties waived forfeiture of license agreement.**

Any forfeiture by sublicensee of license contract based on nonpayment of royalties when due was waived by acceptance of royalties.

10. **Reformation of instruments** ⊙⇒1—**Equity court cannot make new contract for parties.**

Equity court cannot make new contract for parties, if they cannot agree.

**11. Reformation of instruments �købe16—Court must find that, through fraud or mistake, instrument does not express understanding of parties.**

Before court can reform contract, it must find parties intended to make different agreement, and that through fraud or mistake instrument does not express understanding, but expresses something different, which it would be inequitable to enforce.

**12. Reformation of instruments ⊙⊷43—Where one set of attorneys represents all parties, less evidence required to cast on adverse party burden of explanation.**

Where one set of attorneys represented all parties to patent license contract, less evidence was required of one party to cast on other burden of explanation, and situation required utmost good faith and impartial advice.

In Equity. Suit by the Hazeltine Research Corporation and the Independent Radio Manufacturers, Incorporated, against the Freed–Eisemann Radio Corporation. Plaintiffs' complaint and defendant's counterclaim dismissed, with directions.

Pennie, Davis, Marvin & Edmonds, of New York City (H. Bartow Farr, William H. Davis, and Nathan L. Miller, all of New York City, of counsel), for plaintiffs.

Koenig, Sittenfield & Aranow, of New York City (Frank Aranow, Almet F. Jenks, and Walter C. Noyes, all of New York City, of counsel), for defendant.

INCH, District Judge. This is an action in equity. Plaintiff asserts that a certain written sublicense contract should be canceled. The defendant asserts that this contract should not be canceled, but should be reformed as to a certain clause therein, wherein defendant promises to pay a royalty of 6 per cent. on each set manufactured and sold by it. Defendant wants to pay 6 per cent. on patented parts thereof only.

The validity of the Hazeltine patents in the radio art, as well as the validity of certain registered trade-marks associated with the practice of these patents, are not in issue here and remain unaffected by this decision. It has been deemed unnecessary to quote in detail the testimony referred to herein, which seems to me to prove the various facts on which this decision is based.

Suffice it to say that my rather clear recollection of the testimony of the various witnesses, together with my observance of their demeanor, their credibility, interest, etc., coupled with the very great aid given the court by the able counsel on each side, both during the trial and in the subsequent briefs, and finally a complete and careful reading of the stenographer's minutes of the trial, satisfactorily indicates to me the conclusions found. The majority of facts do not seem to be seriously disputed, and it is only after most of such facts have been presented that the parting of the factual way commences, and discloses, in spite of the abundant testimony, a narrow issue.

In November, 1922, a young man, under 30, named Freed, together with another young man, his associate, named Eisemann, were engaged in the business of making radio receiving sets. The art was new. These sets were based on the so-called crystal detector idea. This method produced results, but the whole situation was surrounded somewhat, in the public's mind, with the atmosphere of a new toy. It was the time of the quiet beginning of this new and great and ever-growing business, which in spite of constant scientific development and improvement is but yet in its infancy.

Messrs. Freed-Eisemann had as their patent attorneys a firm of lawyers, Pennie, Davis, Marvin & Edmonds, a well-known and substantial law firm, particularly devoted to patent matters. Two young lawyers, Mr. Russ and Mr. Taylor, were connected with this firm, and they are specifically mentioned, as it is on them that defendant heaps its greatest blame. The evidence, that I credit, shows nothing to indicate to me that they were either incompetent or disloyal, but, on the contrary, it appears that they at all times performed their work in an intelligent and lawyerlike manner.

Certain large concerns had become interested in radio sets, and Messrs. Freed-Eisemann and several other of the then smaller concerns, such as those represented by Mr. Andrea, Mr. Rodman, and others, had formed themselves into what was called the Independent Radio Manufacturers. This was subsequently incorporated and is referred to as the "I. R. M." During most of the time herein mentioned Mr. Freed was secretary of this corporation, and Mr. Rodman was president.

The law firm of Pennie, Davis, Marvin & Edmonds, were the attorneys for this combination and apparently most of the detail work was left to Mr. Russ. It is, however, apparent that Mr. Davis, the head of the firm, was in general charge and was occasionally consulted. About this time a certain professor in a nearby college, Professor Louis A. Hazeltine, had discovered certain improvements in the radio art relating to particular parts in a receiving set, and the said law firm of Pennie, Davis, Marvin & Edmonds was also his patent attorneys.

Bearing the above in mind, we find in November, 1922, Messrs. Freed-Eisemann in consultation with Mr. Russ about certain patent applications of the Freed-Eisemann Radio Corporation. Professor Hazeltine happened to be in said law office consulting Mr. Taylor. Mr. Russ, plainly in the interest of said Freed-Eisemann, suggested to them that perhaps an opportunity existed for them to meet Professor Hazeltine.

Freed's direct testimony, page 64: "A. I said: 'We are making crystal detectors, crystal receiving sets, small receiving sets.' Mr. Russ said: 'Would you be interested in obtaining the right to make a larger type of radio receiver?' I said: 'Why, certainly, we are always interested in new improvements. We are always glad to take new improvements and make sets out of them if we can.' ".

Accordingly Professor Hazeltine and Mr. Taylor were brought in by Mr. Russ and introduced to Messrs. Freed-Eisemann, as the result of which meeting and of this suggestion of Mr. Russ Professor Hazeltine furnished Mr. Freed with a penciled diagram and the latter made for Professor Hazeltine a model. This model did not work as well as expected, but a few days later, under certain changes made by Professor Hazeltine at his college, to which he had taken the model, the result was quite satisfactory.

Although Mr. Russ and Mr. Taylor have been accused of fraud and misrepresentation by Messrs. Freed-Eisemann yet it clearly appears from the above that it was due solely to this opportunity voluntarily suggested by Mr. Russ that Messrs. Freed-Eisemann have made a fortune; for, from what would appear to have been a very small business in crystal sets, which they were doing in November, 1922, Mr. Eisemann testifies that the present net worth of their business, not more than a year and a half afterwards, is $300,000 a year, and that they have employed as high as 570 workmen, and have a very large number of outstanding valuable contracts for the purchase of their sets. The quarter ending December 31, 1922, according to the Freed-Eisemann statement, shows sales of $687,000, and the quarter ending March 31, 1924, sales of $2,000,000.

In the brief of the defendant mention is made that the quarter ending July 1, 1924 (about two months ago), and after the trial, the sales diminished greatly. Whether this was caused by season, as plaintiff claims, or from some other cause, I do not know; but it is somewhat difficult to reconcile this

with the testimony of Mr. Eisemann, as to the present worth of business and outstanding contracts in June, but two weeks before said July 1st. However, the foregoing facts are mentioned, for the reason that all this large sum of money has been made under the sublicense contract herein attacked by the Messrs. Freed-Eisemann by reason of alleged fraud or mistake on the part of said Russ.

It seems to me it could be fairly argued that such a state of facts might suggest gratitude to and not abuse of Mr. Russ and Mr. Taylor. Prior to this lawsuit such a feeling seems to have existed in their minds and in the minds of the others of the I. R. M. At the meeting of the directors of that company held March 9, 1923, the following appears from the minutes:

"The president suggested that the directors show their appreciation of the work done by Mr. Walter C. Russ on behalf of the corporation, outside of his official duties as counsel, in making it possible for the corporation to acquire the sole and exclusive rights to the Hazeltine neutrodyne patents pending. After discussion, the following resolution was proposed, seconded, and unanimously carried:

"Resolved, that the Independent Radio Manufacturers, Inc., is greatly indebted to Mr. Walter C. Russ for the great amount of conscientious and valuable work done by him for the benefit of the corporation in behalf of the crystal detector patent situation and the Hazeltine Neutrodyne license arrangement.

"Further resolved, that in consideration of his valuable services as aforesaid there be issued to Walter C. Russ, or a corporation to be later designated by him, one share of stock in the Independent Radio Manufacturers, Inc., together with a nontransferable and nondivisible sublicense under the Hazeltine patent applications, Nos. 316,000 and 433,729, upon the same terms and conditions as the sublicenses to be issued to the remaining members of this corporation, with the exception that Mr. Russ need not pay $1,000 advance royalties, provided Prof. Hazeltine will waive the same."

This was after the important exclusive license contract with Hazeltine had been secured, but prior to the execution of the several sublicense contracts. Facts calling for gratitude are, of course, not a defense against a proven fraud or a mutual mistake; yet a court of equity should always take a broad view of all the facts and circumstanc-

es and the reasonable inferences arising therefrom.

[1] Returning to the first successful demonstration of Professor Hazeltine's invention, at his college, there were present, besides the professor, Messrs. Freed-Eisemann, Andrea, Rodman, and others of the I. R. M., and we find immediate interest in the commercial value of these inventions and great activity on the part of Freed, Rodman, and others. At the above meeting Mr. Russ, who was subsequently thanked, suggested speed.

A committee of three was appointed, of which Mr. Freed was one, to wait upon the professor and obtain, on terms, an exclusive license, and after several informal meetings among themselves a meeting was had with Professor Hazeltine early in January, 1923, at a restaurant. By that time Professor Hazeltine had applied for two patents. One was shortly, in March, 1923, duly granted. The other was at first rejected, and was not duly granted until the spring of 1924, after this lawsuit had been commenced, and but shortly before the trial.

At this important conference at the restaurant between the committee, seeking to obtain the license, and Professor Hazeltine, who alone could give it, and who alone could impose such terms as he desired in granting it, it appears that Professor Hazeltine expressly insisted on receiving a royalty on the selling price of a set, and not on a part thereof. Mr. Freed would apparently have it understood that Mr. Russ made these terms, I believe the fact is clear, as testified to by Mr. Russ, that the conference was between these gentlemen of the I. R. M. and Professor Hazeltine, and that he simply took notes, as any lawyer would.

Moreover, we have but to refer to Freed's own testimony to show that the terms were those of Professor Hazeltine, the inventor. Mr. Freed was quite comprehensive in stating the conversation: "Mr. Russ said: 'If you build a radio receiving set, and you embody these improvements of the professor, the professor wants you to pay a royalty on the selling price of the machine.' So I said: 'You mean on the selling price of the completed receiver?' Professor Hazeltine said: 'Yes.' Q. Professor Hazeltine or Mr. Russ said that? A. Professor Hazeltine and Mr. Russ both together."

It is plain, therefore, that in spite of his counsel Mr. Freed reiterated that it was Professor Hazeltine himself that imposed the terms, and no one can read Mr. Freed's version of this conversation without being satisfied, it seems to me, that all parties at the conference then knew well that if they desired to obtain this exclusive license for the I. R. M. they must pay a royalty of 6 per cent. on a set and not on a part. This is mentioned because the sublicense is naturally an incident to first obtaining an exclusive license above mentioned, and should and did, under the circumstances here, embody substantially the same terms and conditions.

There is not a word in the case indicating any fraud or mistake as to the making of this exclusive license agreement. The terms being those agreed on between Professor Hazeltine and this committee, a written agreement was drawn up and executed by the parties February 17, 1923; Mr. Freed being then secretary of the I. R. M. and signing the document as such.

The I. R. M. thus became possessed of the important exclusive license. Clause 9 of this license agreement is as follows: "For all apparatus manufactured or sold under this agreement, the I. R. M. agrees for itself and its sublicensees to pay a royalty of 6 per cent. of the licensee's selling price of such apparatus, payment to Professor Hazeltine and other allocations to be in accordance with [paragraph 12] hereof." This is conceded to be 6 per cent. on a set, not a part.

Negotiations now commenced among the members of the I. R. M. as to the issuance of sublicenses. The plan that had been followed included the incorporation of the I. R. M. and the compelling of each sublicensee to be a stockholder therein, etc. These conferences, as to the proper parties, etc., took place at various times from February 17 to May 5, 1923.

So anxious do Messrs. Freed-Eisemann appear that, even before a written sublicense agreement was executed to their company, the Freed-Eisemann Corporation proceeded to do business thereunder. It would appear that Mr. Freed desires to be understood as, having with Mr. Eisemann, been unduly rushed into the signing of its sublicense agreement.

I find the truth to be the contrary. I am convinced that not only was ample opportunity given by the directors of the I. R. M. to themselves, as representatives of concerns seeking a sublicense, to discuss and digest the form of such proposed sublicense, but that each party had in their possession, for that purpose, for some time before, a copy of the proposed agreement.

On or about May 7, 1923, this defendant

duly entered into the written agreement with the I. R. M. by which it became a sublicensee thereof, which agreement contains the following clause: "(4) For all apparatus manufactured or sold under this agreement Freed-Eisemann (Freed-Eisemann Radio Corporation), licensee hereunder, agrees to pay a royalty of 6 per cent. of its selling price of such apparatus." This, also, is conceded to be 6 per cent. on a set, not a part.

Mr. Freed's testimony has already been referred to, where he stated that the terms were those insisted upon by Professor Hazeltine, the inventor, and placed in the exclusive license of the I. R. M., supra. The two clauses are practically identical.

Mr. Freed further testifies as to his full knowledge of the terms in the sublicense agreement from the I. R. M. to the defendant: "Q. And you also knew when you made the contract that the royalty of 6 per cent. was to be computed on the completed apparatus? A. Yes, sir." Both contracts are duly set forth in the complaint, not denied, and it is unnecessary to refer more fully to them. The defendant, therefore, having received its sublicense agreement, proceeded to manufacture and sell sets, with what success has been referred to.

Altogether there were about a dozen other sublicenses issued by the I. R. M. to its stockholders, and these other licensees were originally plaintiffs in this action against defendant. They were stricken out by the court for jurisdictional reasons; they neither being indispensable parties as stockholders, sublicensees, or otherwise. It might be mentioned that none of them was called as a witness by the defendant, although all the sublicense agreements are practically identical.

The first quarter under this sublicense agreement ended July 1, 1923, and a royalty of approximately $2,500 was paid. During the next quarter, ending October 1, 1923, the business of the defendant had increased, and therefore the amount of royalty to be paid out had increased, and it is plain that this latter fact commenced to disturb Messrs. Freed-Eisemann. At any rate, this royalty for three months was now approximately $7,000, and, when the time came to make the payment, it was first paid under protest, but some time later the protest was withdrawn. Also during this summer trouble was first seriously experienced with the practice of parties buying licensed parts only, and completing receiving sets, and in November, 1923, this question was taken up by the I. R. M., at which meeting Mr. Freed was present:

"There was then brought up for discussion the following matter, which was one of the matters for which the meeting was called: The assembly of complete sets from licensed parts as practiced, according to reports, by numerous dealers in New York City, and to consider what steps can be taken promptly to meet the situation. The statement was then made by Mr. Freed, in behalf of the Freed-Eisemann Radio Corporation, which company had presented most of the reports of the assembling of such parts. Mr. Russ, as the patent counsel for the corporation, stated that the assembling by unlicensed persons or concerns of complete sets from licensed parts is not an act of infringement, and hence there would be no cause of action."

Mr. Freed testified that he had no present recollection of having then or afterwards called Mr. Russ's attention to the fact, as now claimed by him and Eisemann, that Mr. Russ had fraudulently or mistakenly previously advised Freed that such cases would be contributory infringement. The result of the above meeting was that the board recommended a proposal that the sublicensees enter into a mutual agreement whereby they would sell licensed parts to the ultimate user only and cease selling parts to jobbers and dealers.

As the business of the defendant increased with great rapidity, the royalties to be paid out by it continued to grow in size. The defendant and possibly one or two others, who were also experiencing success, now commenced to endeavor to substitute a plan to which they hoped they could obtain the consent of the inventor, Professor Hazeltine, that of a lump sum royalty of $30,000 a year, instead of the contract royalty of 6 per cent. on a set.

It is testified to by Freed that he did not divulge to his associates in these negotiations what he knew the actual royalties of his company would or were likely to be (the third quarter, which ended January 1, 1924, showing sales of some $688,000, and royalties of over $40,000), but commenced a campaign to bring about, if possible, the making of a modified agreement as to the basis for royalty payments. While this campaign consisted of the buyers' laments over the contract, and the danger of being put out of business by competition, and certain other pleas not unfamiliar in some business dealings, since 1000 B. C. (Proverbs xx: 14), they finally culminated in the long

letter of December 12, 1923, with some 19 distinct heads, most of which is in the record.

This letter was followed by a conference between Mr. Eisemann and Mr. Davis. The real crux of the letter and of the conference seems to have been, not the question of infringement, if any, but an effort to modify the agreement as to royalty. Mr. Davis promised to see or write Professor Hazeltine.

In view of defendants' claim, it is significant that neither in this letter, nor in any of the considerable correspondence prior thereto, nor in the minutes of the meetings of the I. R. M., is there any statement indicating defendants' alleged grievance, now so strenuously urged on the trial, as to having been defrauded or misled by Mr. Russ or any one. No such statement was made to Mr. Davis.

In view of the methods adopted by the defendants to gain their end, I do not take much stock in their present explanation that this absence was due to an unwillingness on their part to hurt the feeling of Mr. Davis and others. The truth is that such grievance of fraud or mistake as now appears is a sham, and was never thought of until this lawsuit, and was not really worked out then, until most able counsel had vigorously put the answer together.

Thereafter Mr. Davis did communicate with Professor Hazeltine, and so far as I can see the question of whether or not such adjustment could be made was under serious consideration when the due date of the three months quarter, January 1, 1924, came. (See letter from Professor Hazeltine stating that he was ready to consider a proposal from the I. R. M., Defendants Exhibit 46, December 21, 1923.) The defendant did not, therefore, then pay the royalty, which manifestly would have shown a poor basis on which to offer a proposition of but $30,000 a year, and after several letters from the I. R. M. we find that on January 23, 1924, a letter was written to the defendant, calling attention to a previous letter and an interview between Mr. Eisemann and the writer on January 18, and then stating that Professor Hazeltine has just written the writer that he would not consider any modification of the license agreement, unless all royalties due were paid by the licensees.

On the following day the defendant was notified that a firm of accountants were to call on it for the purpose of making an examination of their books, and an account-

3 F.(2d)—12

ant called. He was refused permission by Freed to then examine the books in the absence of counsel for the defendant and Mr. Eisemann, who, the accountant "might have been told, was then at a conference of the I. R. M. in regard to royalties," and no further immediate attempt to examine the books seems to have been made.

This suit was started shortly afterward. Later, and after the suit was started, the examination was allowed. The books were found to be correct in all respects. It can be fairly argued from such circumstances that the plaintiffs desired such examination for its own purposes in the proposed negotiations for a modification, which apparently were open for discussion. After carefully reading all the correspondence, etc., I failed to find, in spite of words here and there, any proof of any attitude that such negotiations were closed.

After suit was commenced and by mutual consent, the royalties for this third quarter and for the subsequent quarters were paid into this court. However ill-advised or unfair was this attempt on the part of the defendant to cover up, pending negotiations for a modification, the real amount of its royalties for this third quarter, it is undisputed that during all this time the defendant, to the knowledge of plaintiffs, continued to be actively engaged, with large publicity, in manufacturing and selling radio sets under the sublicense agreement.

I am inclined to believe that plaintiff has attached undue importance to occasional mistakes in advertising, which apparently were promptly corrected, and it seems to be conceded that the defendants kept true and accurate books. The suit was commenced on February 13, 1924, by plaintiff seeking a cancellation of the sublicense.

The defendant answered, and interposed various amended answers, denying that facts existed on which such relief should be accorded, and making various charges of fraud, etc., and asking that the sublicense agreement, because of fraud or mutual mistake, be reformed, so as to read that defendant promised to pay a royalty of 6 per cent. on each *part* covered by a Hazeltine patent, which amounted to about 30 cents, instead of 6 per cent. on a completed set, which amounted to about $4.50.

These former pleadings were in substance allowed to come in on the trial, on the theory that they might possibly throw some light on the intent of the defendant in its act in withholding the royalties for the quarter or quarters ending prior to the

commencement of the suit. Certain other subsequent acts of the defendant were allowed on the same theory; the claim of plaintiff really being, it seems to me, that the nonpayment when due of the quarter ending January 1, 1924, and the delay as to the previous quarter, when viewed in the light of all the surrounding facts and circumstances and prior and subsequent conduct, indicate a repudiation or forfeiture by defendant of its sublicense contract, and that therefore it should be canceled.

Statements of facts in pleadings, although the latter have ceased to be of value as pleadings, remain like holes in a board from which nails have been removed; but statements accusatory, or conclusions and charges of fraud, while possibly relevant as to intent, do not give any real probative force when withdrawn, and subsequent conduct, in creating counter attacks, should be viewed in a common-sense way, when the passions and prejudices of the parties are at their height, because of the commencement of a suit to take away a lucrative business.

The issues came on for trial on June 5, 1924, and on the trial defendant finally took the following position on which it must stand or fall:

"Judge Jenks: I will read it. (Reading:) The contention by the defendant, in so far as the element of fraud is concerned, is limited and is intended to be limited primarily to the counterclaim for reformation of the contract, in that it was agreed by the contracting parties that the contract would afford the defendant protection against any person who might buy a part, pay a royalty on the part only, and then manufacture an entire complete apparatus, that could be sold in competition with the defendant. In other words, as applied to the facts of this case, as a contributory infringement, and that the contract does not contain such protection, and some measure of equitable relief should be granted by the court to adjust the rights of the parties. Also the defendant contends that untruthful statements were made to and material information was withheld from the defendant regarding the status of the alleged patent, which left the defendant in a state of uncertainty, and which justified the defendant in withholding the royalties. Aside from the foregoing statements, we are not contending that the contract as a whole was obtained by fraud, and we are not seeking a rescission of the same."

[2] It is on the above facts, as I believe them to be, that plaintiffs claim that they have proved a cause of action for the cancellation of the sublicense agreement. The burden of proof rests on plaintiff to prove by a fair preponderance of evidence that the contract should be canceled.

[3] It should also be borne in mind that it is undisputed that defendant's net worth of its present active business is $300,000 a year, and that its sales have run into millions. Accordingly, while a proved repudiation or forfeiture of a contract may not be excused on the grounds of the size of or hardship imposed upon a defendant, yet certainly the court should require clear and satisfactory proof, in such a case, of any such forfeiture or repudiation.

[4] Generally speaking, a license agreement divides itself into two heads: First, the right to practice the invention; second, compensation for this right. The other conditions group themselves subsequent to and under these two main rights or obligations. In the mind of the average inventor the second is probably subordinate to the first, while in the mind of the ordinary business man the reverse is the case. As a matter of fact, it seems to me that the two are equally important.

Where it is solely a question of unpaid compensation, courts of law have exclusive jurisdiction, and can give an adequate remedy. It is for this reason, it seems to me, that it is frequently and correctly said that the mere nonpayment of compensation, in the absence of a clause in the agreement, is no ground in equity for taking away the right to practice the invention.

[5] However, it is fairly plain, it seems to me, that where circumstances show that it is not simply a question of collecting compensation, but that the nonpayment is but an overt act, evidencing with other facts an intention not to duly practice the invention, then the real purpose of the license agreement has been repudiated, and the inventor should have it back from the party, who thus either does not consider it of value or who seeks to pick the brain of the inventor without deeming itself bound to pay for what has been taken from him by reason of the contract. Even in such case the nonpayment is but a part of the necessary proof on the main issue.

This contract did not provide for cancellation of the agreement for nonpayment of royalty. It is apparent that the defendant at no time either did or desired to do anything that would interfere with its continued and successful manufacture and sale of radio sets under the Hazeltine patent, or under its sublicense agreement.

I have carefully read the numerous authorities and decisions cited in the elaborate briefs of both parties, and there is no necessity to refer to them at length. Among them are Walker on Patents, § 308; Hopkins on Patents, §§ 240, 241; Wagner Typewriter Co. v. Watkins (C. C.) 84 F. 57; Foster Hose Co. v. Taylor, 184 F. 71, 106 C. C. A. 467; Rowland v. Biesecker, 185 F. 515, 107 C. C. A. 615; Oscar Barnett Co. v. Crowe, 219 F. 450, 135 C. C. A. 162; Hat-Sweat Co. v. Porter (C. C.) 34 F. 745; Neenan v. Otis Elevator Co. (C. C.) 180 F. 997, 194 F. 414, 114 C. C. A. 376; Dixie Cotton Picker Co. v. Bullock (C. C.) 188 F. 921; Hiner v. Aldrich Co. (D. C.) 255 F. 785; Callanan v. Keeseville R. R. Co., 199 N. Y. 282, 92 N. E. 747. As to Indiana Mfg. Co. v. J. I. Case Co., 154 F. 365, 83 C. C. A. 343, see comment thereon in Chadeloid Chem. Co. v. Charles McAdam Co. (C. C. A. Second Circuit) 298 F. 713, at page 715.

It seems to me that the line running through all these cases shows that these two previously mentioned main rights in a license contract are equally important, but ordinarily are enforced differently—the former in a court of equity by infringement suits, etc.; the latter in a court of law, the same as other contracts. There may be, however, instances where the nonfulfillment of the payment clause is but an overt act, indicating an intention to repudiate or forfeit the right to manufacture, in which case a suit in equity might lie, such as here, to declare the contract forfeited, usually in the state court, or, where diversity of citizenship exists, in the federal court.

[6] Equity does not favor forfeitures. This seems to me to be all that is intended to be meant where the statement is made, and the authorities on which it is based examined, that a mere delay or failure to pay royalties is not a ground for forfeiture.

So in Standard Stoker Co. v. Brewster (C. C. A.) 277 F. 783, Standard Dental Co. v. National Tooth Co. (C. C.) 95 F. 291, and other similar cases, whereby it appears that such nonpayment does not ipso facto cause a forfeiture, even if agreed on. But, nevertheless, the claims of the parties should be presented to the court in a proper suit, and it may determine under all the facts and circumstances that a forfeiture should be decreed. "The best considered 'decisions hold that even licenses containing expressed stipulations for their forfeiture are not, ipso facto, forfeited upon condition broken, but remain operative and pleadable until rescinded by a court of equity.'" Standard Mfg. Co. v. National Tooth Co., supra.

[7] It further appears that even after hearing all facts, and aside from the burden of proof being met as to the facts, the court should consider whether, under all such facts and circumstances, it would be inequitable and unjust to permit the cancellation of the contract. Standard Stoker Co., Inc., v. Brewster, supra.

[8] It seems to me, therefore, that plaintiff's case narrows down to this: A sublicensee manufactured and sold the patented articles from the date of the sublicense up to the time of this trial, a period of about a year, and is continuing to manufacture and sell under this license. That during this time the said licensee has built up a very large and important business, which will be entirely taken away by declaring a forfeiture of the right to manufacture. That under the written license agreement this licensee was to pay a royalty of 6 per cent. on each set, and such payments were to be paid on July 1 and October 1, 1923, and January 1 and April 1, 1924. That defendant kept true and accurate books and paid the royalties due on July 1, and after some dispute, but with, so far as I can see, no claim as to forfeiture, the royalties due October, 1, 1923. That during this time, and up to the commencement of this suit, a constant effort was being made by this licensee to obtain by consent from the inventor a modification of the aforesaid royalty clause, by substituting a lump sum royalty instead of that in the agreement, the sum proposed being $30,000 a year. That the plaintiffs were at least considering this proposition, and on December 21, 1923, and also but a week or so prior to this suit, to wit, January 24, 1924, and almost a month after the royalty payment was technically due, there was yet no plain claim made that for such nonpayment the licensor considered, or would consider in case of further delay that the license would be forfeited. That, on the contrary, plaintiffs, after expressly stating defendant's position to be a desire to withhold its return pending the consideration of its proposition of paying a lump sum royalty, and that this had been presented to the inventor, had replied that the inventor would·not consider any modification affecting the royalty payments of any members of the I. R. M., *unless these members had paid all royalties due.* That this was immediately followed up by a request by plaintiffs to allow the books of the licensee to be examined under the circumstances above mentioned.

It is plain, therefore, to me, in view of these letters and other facts above mentioned, that defendant might reasonably have believed that possibly its proposition to pay a lump sum would eventually be accepted, and that pending such negotiation, and in the absence of a definite attitude as to forfeiture on the part of plaintiffs, it might be best not to show, for the time being, unless absolutely necessary, what the royalties for the unpaid quarter were. It was under such a situation that plaintiff brought its suit on February 13, 1924, not to recover the royalties, but to declare the license forfeited, principally on the ground of nonpayment of the royalties for this quarter ending January 1, 1924.

[9] Any forfeiture, based on nonpayment when due of prior royalties, had been waived by the plaintiffs accepting same. It therefore would appear that the right of plaintiffs to have it declared that the sublicense should be forfeited rests on this delayed payment of the royalties due January 1, 1924, and the intent behind same as evidenced by all the surrounding facts and circumstances. I believe that an adequate remedy at law existed under the circumstances here. I fail to find a repudiation.

Aside, therefore, from the failure of the plaintiffs to show here by clear and convincing evidence that defendant repudiated the contract by its delay in paying the said royalties, and the existence of a remedy at law, it seems to me that under such circumstances it would also be both unjust and inequitable to take from defendant the valuable right to manufacture, which it was and is consistently and to plaintiff's knowledge using, solely because, as a part of negotiation for a modification of the license, it improperly or by bad advice withheld information which would be given from payment or its books, which it deemed might affect its proposition.

I am not in any way approving this annoying campaign of the defendant, with its baseless and unfair assertions, and its, among other things, unfounded charges as to failure of plaintiff to carry out its contract as to infringers. Foster v. Goldschmidt (C. C.) 21 F. 70. Nor do I justify defendant in withholding the royalties due January 1, 1924, on the ground of invalidity of patents claimed to have been feared by defendant. The contracts were issued under application for patents, and one patent had already been granted. Neither the issues here nor the facts make this a case such as, St. Paul Plow Works v. Starling, 140 U. S. 184, 11 S. Ct. 803, 35 L. Ed. 404.

I am simply holding that on all the facts and circumstances here plaintiffs not only seem to me to have failed to prove by a preponderance of evidence that the nonpayment of the royalties due January 1, 1924, and the other subordinate omissions, had behind them such an intention as to justify a finding that thereby defendant intended to and did forfeit and repudiate the sublicense agreement, which alone, it seems to me, would justify this court of equity in declaring such agreement canceled, but that plaintiff's remedy was at law, and that on the facts here it would be inequitable to cancel the contract.

[10] This leaves the question of whether or not the said sublicense agreement should be reformed as claimed by defendant. I do not attach much importance to this side of the case, for the reason that I find that there was neither fraud nor mistake, and it is on the facts here a request for the court to make a new contract between the parties, which it seems to me needs no citation of authority to show lack of power in the court to do. I believe that the learned judge, now one of the counsel for defendant, will agree that this at least is one of the things that even equity cannot do. Penn. Co. v. N. Y. Ry. Co., 198 F. 721–737, 117 C. C. A. 503.

It is plain that the parties to this contract both knew what they were doing, and as for experience in patent matters I think Mr. Freed had as much as Mr. Russ, although this is not said in any disparaging way, for it was Freed who had previously made an exhaustive search in the radio art, and he and Eisemann, I am convinced, knew all the ins and outs of the business. In fact, this is but the culmination of the effort to substitute a lump sum royalty which has been the burden of the defendants ever since they commenced to make real money. Even if the contract had a clause allowing a possible modification, this would not "permit the court to make a new contract for the parties in case they are unable to agree." 13 Corpus Juris, p. 519.

[11] Possibly, if defendant had been able to prove fraud or mistake inducing them to enter into the contract, this might have been ground for a rescission; but that is exactly what the defendant does not want. Before the court can reform this contract, it must find that the parties' minds really met on an agreement to pay a royalty of 6 per cent. on the patented parts alone, and that through fraud or mutual mistake the written instrument now does not express this understanding, but expresses something dif

ferent, which it would be inequitable and unjust to hold the defendant bound by.

I believe that no one can read this record without becoming convinced that, whatever else happened, one thing is certain, and that is that the parties never agreed, either in the original license or the sublicense, that royalties should be paid on a part alone. It is not necessary for me to advert to the defendant's case, and its failure to produce any one of the other dozen sublicensees, whose contracts were similar, and who might reasonably be expected to have a recollection similar to defendant, as several witnesses were present at the various interviews, or to its failure to make in its letters and con-sultations, etc., the claim now asserted.

Aside from defendant's oral testimony, I cannot agree with counsel's argument that it is probable that what Freed and Eisemann testified to took place, for I deem it quite improbable that a lawyer like Russ would give advice which I am convinced Freed would have known was wrong, and that, during the months intervening between the sign-ing of the sublicense and the commencement of the suit, this fact not have been reiterat-ed time and again in express form by both Freed and Eisemann. Allen's testimony is of no value.

[12] I fully agree that where one set of attorneys represent all parties, as here, less evidence is required of one party to cast up-on the other the burden of explanation, and that such a situation requires the utmost good faith and impartial advice. The bur-den of proof, however, remained on the de-fendant, and I am satisfied that not only was a complete and satisfactory explanation giv-en, but that defendant has entirely failed to prove a case requiring or allowing this court to reform the contract.

I am unable to stop here without saying that it seems to me that charges of fraud and professional misconduct should not lightly be put aside. Not only should they require the clearest and most substantial proof, but they should not be made unless such proof seems to be available.

Business emergencies or greed require no such sacrifice as an attempt upon a young lawyer's honor and future, nor justify an attempt to get more money than allowed by a contract, by trying to besmirch the hard-earned reputation of an established firm of reputable lawyers, unless facts are present-ed in a credible form that plainly show that unfortunately some temptation has been yielded to.

Counsel, of course, must take such con-versations and similar personal evidence from their clients, and, believing in their clients, do the best they can to win for it what they believe to be just and proper; but as to the client, I am convinced in this case, that neither Mr. Freed nor Mr. Eisemann were ever misled by any one, except them-selves, into thinking that, having made a lot of money, they could pay Professor Hazel-tine, by negotiation, a great deal less than they had formerly eagerly agreed to pay him when the business started. I endeavor to make plain in this decision that I think that there may be cases where nonpayment of royalties is a sufficient act, provided there are other proper facts and circumstances surrounding it, on which to base a forfei-ture.

As to plaintiff's fear that a failure to de-clare a forfeiture upon the testimony be-fore me will be an invitation to other sub-licensees to similarly embarrass plaintiffs, I cannot agree, for the reason that apparently all the other sublicensees are satisfied with their contracts, and if such is not the case, at least to the extent of not chancing an ex-pressed intention on the part of plaintiffs, that there will be no negotiations for modi-fication, and that nonpayment of royalties when due under their contract will be consid-ered evidence of forfeiture, and then possi-bly having a court subsequently hold that, in view of such act and expressed intent, such nonpayment, together with all the other cir-cumstances duly proved, indicate a forfeiture of the agreement.

The motion to strike out certain testimony, while I do not attach importance to same, is denied. The only other motion is as to ju-risdiction, and I see nothing in this record to change my previous ruling.

Accordingly, I am compelled to dismiss the complaint, with costs and disbursements, and dismiss the counterclaim on the merits, with costs and disbursements, and while I have some doubt, in view of the nature of this case, whether or not I can direct in this suit payment of royalties (Consolidated Co. v. Wolf [C. C.] 28 F. 814), nevertheless, as same by mutual consent were paid into court and are subject to its order, and there seems no dispute that they are due to plaintiffs, provided the contract is not reformed or canceled, I direct that such royalties that have been paid in be turned over to the plaintiff Independent Radio Manufacturers, Inc., Graselli Chem. Co. v. Ætna Co., 252 F. 456, 459, 164 C. C. A. 380. Clerk's fees to be divided.

As to the question of interest, the money has not been in the possession of the de-fendant since payment into court; but the

royalties due January 1, 1924, should have been paid when due. It would seem that interest should be paid from that time to time of payment into court; however, that matter can be taken up at the time of the settlement of the decree.

Settle decree on notice.