# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 17, 2020      Decided March 13, 2020

No. 19-1085

IRREGULATORS, ET AL.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of Orders of the
Federal Communications Commission

———

*W. Scott McCollough* argued the cause and filed briefs for petitioners.

*Matthew J. Dunne*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert Nicholson* and *Kathleen Simpson Kiernan*, Attorneys, U.S. Department of Justice, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission, *Ashley Boizelle*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Robert J. Wiggers*, Attorney, U.S. Department of Justice, *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission, and *Thaila Sundaresan*, Counsel, entered appearances.

2

*Gregory J. Vogt*, *Regina McNeil*, and *Robert Deegan* were on the brief for *amici curiae* National Exchange Carrier Association, Inc., et al. in support of respondents.

Before: ROGERS and KATSAS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Six individual petitioners challenge a Federal Communications Commission order approving the continued use of admittedly outdated accounting rules for an ever-dwindling number of telephone companies whose pricing is governed by those rules. But those individuals have presented no evidence that the continuing application of the frozen rules has harmed them or is likely to harm them. The individuals don't purchase telephone service from a provider whose rates are directly affected by the rules. And they have not shown how the rules distort the market to their disadvantage or otherwise harm them indirectly. The petitioners therefore lack the necessary Article III standing to challenge the Commission's order, and we must dismiss their petition for review.

\* \* \*

Understanding this case requires something of a trip down memory lane through the history of regulatory control over telephone rates.

Until the early 1990s, the Commission regulated wireline interstate telephone providers by the "rate-of-return" method, allowing a firm to charge "rates no higher than necessary to obtain 'sufficient revenue to cover their costs and achieve a fair return on equity.'" *Nat'l Rural Telecom Ass'n v. FCC*, 988

F.2d 174, 178 (D.C. Cir. 1993) (quoting *In re Policy & Rules Concerning Rates for Dominant Carriers*, 3 F.C.C. Rcd. 3195 (1988)). Roughly thirty years ago, the Commission "began to take serious note of some of the inefficiencies inherent in rate-of-return regulation." *Id*. Because firms "can pass any cost along to" their customers, rate-of-return carriers have little incentive to pursue innovative cost-reductions. *Id*. Rate-of-return carriers also have perverse incentives to shift costs "away from unregulated activities (where consumers would react to higher prices by reducing their purchases) into the regulated ones (where the price increase will cause little or no drop in sales because under regulation the prices are in a range where demand is relatively unresponsive to price changes)." *Id*.

The Commission's solution was price-cap regulation, in which it sets a maximum rate, subject to later periodic adjustments. The caps initially chosen were the firms' then-existing rates, which were to be subject in the future to various adjustments—adjustments that were unlikely, for any one firm, to be significantly affected by its success or failure at cost reduction. Besides improving the regulated firms' incentives, price-cap regulation has a benefit quite relevant here: it eliminates the need for the costly, cumbersome accounting rules inherent in the rate-of-return method. *Id*.

The Commission first adopted price-cap regulation in 1989, and we upheld its choice against a number of challenges. *Id*. at 177–85. The shift was at first mandatory only for the Bell companies and GTE, with other local exchange carriers entitled to remain under rate-of-return regulation at their option. See *id*. at 179; *In re Policy & Rules Concerning Rates for Dominant Carriers*, 6 F.C.C. Rcd. 2637 ¶ 10 (1991). Today, the Commission reports and the petitioners do not contest, 93% of the phone lines currently subject to either of these two forms of rate regulation are under price caps. See Resp. Br. 4.

This case involves the separations processes set forth by the Commission in 47 C.F.R. Part 36 and which are today used (as we shall soon see) by rate-of-return carriers. The Commission devised the system in fulfillment of its statutory mandates to "prescribe a uniform system of accounts for use by telephone companies," 47 U.S.C. § 220(a)(2), and to regulate interstate—but not intrastate—telecommunications service, 47 U.S.C. § 221; see also *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355 (1986).

Jurisdictional separations involve two steps: The first is for a firm to assign its costs (already recorded in various Commission-prescribed "accounts") to categories specified by the Commission. These categories seem generally to represent aggregations of the various "accounts" in which firms initially record their costs, but are in some cases disaggregated into subcategories. See *In re Jurisdictional Separations & Referral to Fed.-State Joint Bd.*, 16 F.C.C. Rcd. 11,382 ¶ 4 & n.12 (2001) ("2001 Freeze Order"); see also, e.g., 47 C.F.R. § 36.123. The categories are presumably designed to facilitate application of the second step: apportionment of the costs in each category between intrastate and interstate jurisdictions.

The apportionment is governed by rules which vary depending on the cost in question. Some have for example a "fixed allocator." 2001 Freeze Order ¶ 4. Others fluctuate with use as between interstate and intrastate service and thus vary in their application from year to year. See *id.*; see also, e.g., 47 C.F.R. § 36.123.

In 2001, the Commission realized that its complicated Part 36 jurisdictional separations rules, initially developed for a world of analog "circuit-switched networks," no longer reflected an increasingly digital reality. 2001 Freeze Order ¶ 1. What's more, the separations process required carriers to perform cumbersome separations studies, *id.* ¶ 13, measuring

for instance the "the relative number of weighted standard work seconds" a switchboard handled, 47 C.F.R. § 36.123(b).

So the Commission decided to effectuate a temporary, five-year freeze "pending comprehensive reform." 2001 Freeze Order ¶ 2. To the extent that the law required price-cap carriers to continue to report costs according to a "uniform system of accounts," 47 U.S.C. § 220(a)(2), the Commission simply froze the category relationships and allocations factors based on "the carriers' calendar-year 2000 separations studies." 2001 Freeze Order ¶ 9. For rate-of-return carriers for whom the rules still determined the actual prices those carriers could charge, the Commission froze the allocation factors and gave the rate-of-return carriers the option, but not the requirement, to also freeze their category relationships. *Id*. ¶ 11.

As a result of the freeze, all carriers were spared the need "to measure usage in order to develop jurisdictional allocation factors for interstate purposes, as frozen factors [would] be carried forward from year to year," and many carriers no longer needed "to perform the analyses necessary to categorize annual investment changes for interstate purposes." See *In re Jurisdictional Separations Reform & Referral to Fed.-State Joint Bd.*, 15 F.C.C. Rcd. 13,160 ¶ 19 (2000).

The five years provided for in the 2001 Freeze Order came and went—and the Commission extended the jurisdictional separations freeze for three more years. *In re Jurisdictional Separations & Referral to Fed.-State Joint Bd.*, 21 F.C.C. Rcd. 5516 ¶ 16 (2006). Over the next several years, the Commission extended the freeze seven more times, the last such extension being the Order now before us: *In re Jurisdictional Separations & Referral to the Federal-State Joint Board*, No. CC80-286, 2018 WL 6629368 (2018) ("2018 Order"). See *id.* ¶ 12 (outlining prior freeze extensions); see also *id*. ¶ 4 (extending the freeze "for up to six years"). The Commission

has also allowed those rate-of-return carriers that froze their category relationships in 2001 (the first step in Part 36's two-step process) a one-time option to "unfreeze and update" those relationships. *Id.* ¶ 19.

\* \* \*

The petitioners challenge the most recent iteration of the freeze as established in the 2018 Order. But because none of them possesses Article III standing, we do not rule on the merits but instead dismiss their petition for lack of jurisdiction.[1]

The Constitution permits us to rule only on tangible "Cases" or "Controversies," not abstract hypotheticals or requests for advisory opinions. U.S. Const. art. III, sec. 2. A party seeking review of an agency's action must therefore have standing to pursue the action before our court, a rule that has come to require that the party has suffered or will likely suffer an injury in fact traceable to an act of the defendant and redressable by a favorable decision. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The petitioners in this case are six individuals and two informal, unincorporated organizations formed to advance the

---

[1] The petitioners set forth arguments for standing and associated evidence in a lengthy, unpaginated document attached to their docketing statement, part but not all of which they reproduce in a sequentially paginated addendum to their opening brief. Though we will consider these materials, we do not pass on whether this submission complies with D.C. Circuit Rule 15(c)(2), which permits "a brief statement" regarding a "claim of standing." For legal arguments, we cite to a brief-like section of the docketing statement styled "Petitioners' Standing Argument," using its internal pagination.

petitioners' chosen positions on telecommunications policy. Because the petitioners offer no evidence of injury unique to the organizations themselves, those organizations will have associational standing only if a member possesses standing. We therefore focus our attention on the individual petitioners. See *NARUC v. FCC*, 851 F.3d 1324, 1327 (D.C. Cir. 2017) (per curiam) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right . . . ." (cleaned up)). The individual petitioners bear the burden of establishing a substantial probability of standing, which they may meet with affidavits submitted to this court or evidence already in the administrative record. *Id*.

We address each of petitioners' theories of standing below, and show where the petitioners fall short, beginning with the petitioners' theories about how the jurisdictional separations freeze still affects price-cap carriers and ending with the petitioners' arguments that they suffer harms from the Part 36 rules' effects on rate-of-return carriers.

1. The petitioners' apparent main concern and their chief theory of injury is that the freeze distorts price-cap carriers' rates. As the petitioners see things, state regulators (particularly those of New York) still use Commission-established jurisdictional separations to regulate major price-cap carriers' intrastate rates and, when doing so, are subject to the Commission's freeze. If, as petitioners allege, the frozen separations cause intrastate rates to be higher than they would under a modernized system, individual petitioners purchasing intrastate service from price-cap carriers are likely to be harmed. Critical to this theory is the idea that state regulators are compelled by federal law to apply the frozen federal separations to the intrastate rates of price-cap carriers.

Petitioners offer no basis to believe that such compulsion exists. In fact the Commission appears to have extinguished such compulsion, using its authority under the Telecommunications Act of 1996, 47 U.S.C. § 160, to "forbear from applying" provisions of the Act when it determines (1) that they are "not necessary to ensure" "just and reasonable" rates, (2) that they are not needed to protect consumers, and (3) that forbearance is "consistent with the public interest," in particular that such forbearance "will promote competitive market conditions." *Id.* § 160(a), (b). In the years since the initial 2001 freeze order, it has issued orders, initially conditional and later unconditional, forbearing from requiring price-cap carriers to apply the Part 36 separations process at all. 2018 Order ¶ 16 n.45. Because that process was useful only for rate-of-return price regulation, it had no further role in federal regulation of these carriers' interstate rates.

That federal forbearance is naturally consistent with states' having authority to impose their own accounting methods on price-cap carriers for the purpose of regulating intrastate rates. The relevant portion of the initial forbearance order, which the Commission subsequently incorporated by reference for all price-cap carriers, is worth quoting in full:

> We recognize that state commissions may exercise their own state authority to conduct their rate and other regulation as permitted under state law. We emphasize that we do not in this Order preempt any state accounting requirements adopted under state authority. We recognize, as the State Members point out, that section 10(e) [47 U.S.C. § 160(e)] states that "[a] State commission may not continue to apply or enforce any provision of this Act that the Commission has determined to forbear from applying" under section 10. Although states will not have authority to enforce the federal Cost Assignment Rules as they

apply to AT&T once this relief is effective, we do not read section 10(e) to prevent states from adopting similar provisions to the extent that they have authority under state law. In the wake of this decision, we would expect that any states that may rely on the Cost Assignment Rules and resulting data for state regulatory purposes would assert their jurisdiction to obtain the needed information from AT&T.

*In re Petition of AT&T Inc. for Forbearance*, 23 F.C.C. Rcd. 7302 ¶ 33 (2008); see also *In re Petition of USTelecom for Forbearance*, 28 F.C.C. Rcd. 7627 ¶ 49 (2013) (incorporating the AT&T Order's preemption analysis when granting remaining price-cap carriers similar forbearance from Part 36 rules). This means that any injuries the petitioners suffer through the application of outmoded Part 36 rules to price-cap carriers are traceable not to the Commission's freeze order but to the states' voluntary and independent decisions to use the rules of Part 36 for their own purposes.

To be sure, the petitioners have identified one state commission that in a brief dictum expressed the belief that the federal separations rules "likely preempted" any different state accounting methods. See *Northern New England Tel. Operations LLC*, 2014 WL 6722276, at *32 (Me. Pub. Util. Comm'n, 2014) ("We reject the notion that a novel (and likely preempted) attempt at reforming the cost allocation rules . . . would in any manner be helpful in establishing an appropriate level of MUSF support."). To the extent the "likely preempted" parenthetical is more than a throwaway phrase, we see no basis for it in light of general preemption principles and the language of the Commission's forbearance decisions. Petitioners' claim of a direct effect from the freeze on price-cap carriers' intrastate rates is thoroughly mistaken. See *United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction.").

2. Petitioners generally claim that "frozen separations over-allocate costs to intrastate [service]. . . whereas they under-allocate costs to interstate, thereby allowing for artificially low interstate rates." Petitioners' Standing Argument, 19. As we just saw, only rate-of-return carriers are governed by the frozen separations, so any injury in this category must derive from their pricing.

Petitioners' difficulty is that even if they are correct that rate-of-return intrastate prices are too high, they have presented no evidence—and certainly not enough evidence to show a substantial probability—that these intrastate prices affect them personally.

For starters, none of the petitioners claims to purchase intrastate service from a rate-of-return carrier directly—hardly a surprise, given the reduced role of rate-of-return carriers. One petitioner states that he has traveled on business to every state in the Union except New Mexico and Alaska, and he has "consumed local telecommunications services" while on the road. Pet. Br. Addendum 166. But he does not claim that he has paid for these local services directly, only that he has, like many travelers, used a phone while away from home.

The petitioners indeed do claim that they pay the prices charged by rate-of-return carriers indirectly. Their providers, they say, pay inflated prices for wholesale service from rate-of-return carriers to complete long distance calls into rate-of-return networks; the providers then pass those inflated costs along to customers such as petitioners.

The underlying economic principle invoked by petitioners is sound at a high level of generality (firms generally pass on the costs of necessary inputs), but the record undermines their claim that it links the separations freeze to any impact on them. When adjusted for market size, comparatively few phone

companies are subject to the jurisdictional separations rules in setting prices. Once we include (unregulated) mobile wireless providers in the mix, according to the Commission, the frozen rules apply to just 0.8% of all total phone connections. See Resp. Br. 13 n.4. That means the wholesale rates charged petitioners' providers by rate-of-return carriers are, by any metric, a very small portion of the former's total costs. While a perfectly efficient and completely competitive telecommunications market would transfer those inflated wholesale costs to retail customers, the petitioners provide no tangible evidence and offer only naked assertions that any such transfer has had an impact on them. This theory of harm "stacks speculation upon hypothetical upon speculation" and thus "does not establish an actual or imminent injury." *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 931 (D.C. Cir. 2018) (quotation omitted).

3. The petitioners believe that the frozen jurisdictional rules distort the telecommunications marketplace generally. See Petitioners' Standing Argument, 30; Reply Br. 14. Though the petitioners don't detail the nature of the distortion, one can imagine some.

For instance, the frozen rules may lead rate-of-return carriers to charge inflated prices for local service. Where a price-cap carrier or a wireless carrier competes with a rate-of-return carrier to provide local service, and the rate-of-return carrier's rates have been inflated by the freeze order, the price-cap carrier will be able to raise its prices without losing customers to the disproportionately expensive rate-of-return competition.

Again, petitioners offer no relevant evidence. Specifically they offer nothing to show that their providers—or any providers competing with rate-of-return carriers—artificially inflate their prices for local service. Moreover, the price-cap

carriers serving the petitioners might be charging the maximum amount permitted under the price cap anyway. Given the infinitesimally small share of phone calls provided by rate-of-return carriers, we can see no justification for converting petitioners' suppositions into fact.

Alternatively, a similar market distortion might arise if carriers can cross-subsidize unregulated activities by charging inflated prices for intrastate regulated services. In particular, petitioners believe that such cross-subsidization occurs in states that allegedly use federal separations results to set price-cap carriers' intrastate rates. Reply Br. 14–15. But to the extent that such cross-subsidization exists at all and to the extent that it meaningfully impairs competition, it is due to the states' independent decisions to apply the Part 36 rules, as discussed above.

4. The petitioners' fourth and final theory of injury rests on the idea that frozen category relationships allow rate-of-return carriers to receive inflated sums from the federal Universal Service Fund (USF), which causes the petitioners to pay higher USF charges on their phone bills. Again petitioners fail to demonstrate a substantial probability of a tangible injury.

Today, USF directly subsidizes (among other things) telephone companies serving high-cost areas of the country. See Federal Communications Commission, *Universal Service Fund*, https://www.fcc.gov/general/universal-service-fund; see also 47 U.S.C. § 254 (providing statutory authority). USF is funded by mandatory contributions from all telephone companies, which the companies may "recover" by including a separate USF charge on their customers' retail phone bills. See 47 C.F.R. § 54.712.

It is true that the administrator of universal service support uses aspects of Part 36 for some support calculations. See 2018

Order ¶ 18. But see *id*. ¶ 17 (describing changes in the universal service systems that give rate-of-return carriers the right to calculate high-cost universal service support by means that "eliminated the need for those carriers to perform cost studies that required jurisdictional separations"). But the administrator in 2011 froze high-cost support in order "to transition universal service from focusing on voice networks to supporting and expanding broadband availability." Universal Service Administrative Company, *Frozen High Cost Support*, https://www.usac.org/high-cost/funds/frozen-high-cost-support/. Petitioners have offered no reason for us to conclude that, despite this freeze, a shift to updated and more accurate separations results would actually lower the support received by rate-of-return carriers, and thus lower the USF charges the petitioners pay.

* * *

Because the petitioners lack standing to bring this petition, we lack jurisdiction to adjudicate their claims and so dismiss their petition.

*So ordered.*